2011 Ark. App. 442

**Derek and Andrea PIPPINGER,
Appellants**

v.

**Doris BENSON and Bertie Blasingame,
Appellees.**

**No. CA 10–900.**

Court of Appeals of Arkansas.

June 15, 2011.

Rehearing Denied July 27, 2011.

Chesley David Dunlap, Trumann, for appellants.

Melissa Bristow Richardson, Jonesboro, for appellees.

WAYMOND M. BROWN, Judge.

This appeal involves young J.P. J.P.'s mother passed away, and his father, Derek, later remarried Andrea Pippinger (J.P.'s godmother). Andrea later petitioned to adopt J.P. Doris Benson and Bertie Blasingame, J.P.'s maternal grandmother and great-grandmother, opposed the petition and filed a request for visitation. After a trial, the circuit court denied Andrea's adoption petition and ordered visitation. The Pippingers argue that the circuit court erred in (1) allowing Benson and Blasingame to intervene in the adoption proceeding, (2) ordering visitation, and (3) denying Andrea's adoption petition. The circuit court did not err in allowing Benson and Blasingame to be heard on Andrea's adoption petition, as the two stood in loco parentis to J.P. Further, the circuit court did not err in granting Benson and Blasingame visitation or in denying Andrea's adoption petition. Accordingly, we affirm.

## Background

J.P., the son of Derek and Angela Pippinger, was born on December 28, 2006. Andrea and her then-husband Joey Craig (Derek and Angela's friends since high school) were named godparents. After his birth, J.P. spent a lot of time at Blasingame's house. J.P. had to have surgery at six weeks, and upon being discharged from the hospital, Derek and Angela took J.P. to their mobile home. Blasingame spent the night, while Benson and her husband took turns helping taking care of J.P. Soon after, however, everyone went to Blasingame's home to stay. The parties disputed exactly how much time J.P. spent with Blasingame. Benson and Blasingame stated that J.P. spent about ninety percent of the first year of his life in Blasingame's home. In contrast, Derek said that, at most, J.P. would spend two nights during the week plus the weekends at Blasingame's residence. Whatever the case may have been, this was the arrangement until Angela's untimely death in January 2008. J.P. was thirteen months old.

After Angela's death, Derek took J.P. to live with him. Derek told his family that he did not want J.P. to be around so much emotion. But he and J.P. still visited Blasingame's home every weekend. Derek took J.P. to Andrea's house whenever he needed a babysitter. While Andrea was babysitting J.P., Benson and Blasingame were not allowed to call or visit. Derek denied having anything to do with this decision, explaining in court that the rule was established by Andrea and Joey. In the summer of 2008 Andrea divorced Joey, and she started dating Derek soon after. About a month after they started dating, Derek moved in with Andrea and her children. He later asked Benson and Blasingame to move into his mobile home (for insurance purposes, according to Derek).

There were several disputes between the parties. In November 2008, Derek and Benson got into an argument as Benson was trying to move out of Derek's mobile home. Derek had brought Andrea and J.P. by the home. At some point, he instructed Andrea to take J.P. home. Andrea yelled at Benson, "You and the bitch on top of the hill [referring to Blasingame, who lived on top of a hill] killed my best friend." (Andrea later explained in her testimony that she thought that Benson and Blasingame tried to control Angela). After Andrea returned J.P. to their vehicle, Derek started yelling at Benson, asking her where his property was. (He thought that Benson had removed some of his property from the mobile home.) Derek later called the police, and the police escorted Benson off the property. After that argument, Derek rarely allowed Benson or Blasingame to see J.P. unsupervised outside of his home. Derek claimed that part of the reason for the limited contact was the fact that the trailer had dog feces on the floor and maggots crawling in the pans. He stated that he had no concerns about Blasingame's residence, as she was a good housekeeper, but he did not allow J.P. to go over there because Benson would be there.

In spring 2009, Derek and Blasingame got into an argument. During the argument, Blasingame said to him, "You didn't really love Angela, did you?" This made Derek mad. Blasingame denied accusing Derek of having an affair with Andrea. She claimed that people around town were talking about the fact that Derek and Andrea got together so quickly after Angela's death.

Derek and Andrea married in May 2009. Two months later, Andrea filed a petition to adopt J.P. Derek consented to the adoption. Benson and her husband received notice of the adoption petition. The court was prepared to have a hearing on the adoption petition in September

2009, but the hearing was continued to allow a full day for the hearing. Benson was not present at the hearing, but Blasingame was and requested an opportunity to be heard. Soon after, Benson and Blasingame filed an answer to Andrea's adoption petition, a motion to intervene in the adoption proceeding, and a petition to establish grandparent/great-grandparent visitation. The Pippingers filed a motion to strike this pleading, but the circuit court denied the motion in a pretrial hearing. Benson and Blasingame also filed a separate petition in the domestic relations division of circuit court for grandparent/great-grandparent visitation.

The court held a trial on both the petition to adopt and on the visitation request in March 2010. The court heard testimony from the parties as well as Donna Pippinger (Derek's mother, who supported the adoption petition) and Gerald Benson (Doris's husband, who supported his wife's visitation petition but would have preferred for the entire matter to have been settled without court intervention). Benson and Blasingame opposed the adoption petition, opining that it was too soon after Angela's death and Andrea's marriage to Derek. Both were also concerned that they would never get to see J.P. again if the court did not award visitation, and they said that they would cooperate with Derek if the court awarded visitation.

When asked why he wanted limited visitation between J.P. and Benson and Blasingame, Derek testified that they were old and not in good health; that Benson's husband drinks; that they were constantly reminding J.P. of Angela; and that they were doing things that were unhealthy for his mental and emotional well being. He did not see any ill effects of limiting Benson's and Blasingame's access to J.P. Derek explained that he would allow unsupervised visitation in the future. He also did not want Benson and Blasingame to talk about Angela to J.P., stating that he would talk to him about his biological mother when he was old enough to understand. Regarding Andrea's adoption petition, Derek stated that he wanted security for J.P. and that he was concerned about a custody battle with Benson and Blasingame without the adoption petition.

After the trial, the court issued a letter opinion explaining that it was ordering grandparent/great-grandparent visitation and denying the petition to adopt. The court found Benson and Blasingame to be more credible than the Pippingers throughout the proceeding.

On Benson and Blasingame's visitation petition, it found that Benson and Blasingame overcame the presumption that Derek's decision to restrict contact was in J.P.'s best interest. As to the most litigated element of proof regarding the visitation decision, the harm likely caused by the loss of the relationship between J.P. and Benson and Blasingame, the court believed that Derek's concerns were speculative and unsupported by the evidence. It was suspicious of the fact that his concerns about Benson and Blasingame did not materialize until after the disagreement regarding use of Derek's mobile home.

Regarding Andrea's request to adopt J.P., the court relied on many of its findings that it relied upon to grant Benson and Blasingame's visitation motion. It described Andrea's attitude toward J.P. as being "possessive and exclusive of the maternal family." It concluded that it would not be in J.P.'s best interest to lose his relationship with Angela's family and an adoption would not be conducive to fostering that relationship.

The circuit court entered an order containing the findings in its letter opinion in July 2010. The Pippingers filed a timely notice of appeal from that order.

### Benson and Blasingame's Motion to Intervene

First, the Pippingers argue that the circuit court should not have allowed Benson and Blasingame to intervene in the adoption proceeding. They acknowledge that the Bensons were entitled to notice to the proceedings,[1] but they rely on the supreme court's decision *In re Adoption of Tompkins*[2] to support their argument that there was no corresponding right to intervene. They further argue that, because the statute extends the right only to grandparents and not great-grandparents, Blasingame had absolutely no right to participate. Benson and Blasingame frame the issue differently. They argue that the court consolidated both Andrea's adoption petition and their visitation request for the purposes of trial. They contend that the consolidation of the actions was proper.

■ In *Tompkins*, the supreme court held that the statute entitling grandparents to notice in an adoption proceeding did not provide a corresponding right to intervene or to be heard in a proceeding. It stated that the adoption statute had to be strictly construed and applied[3] and that, had the General Assembly intended to give grandparents a right to be heard, the General Assembly could have easily conferred that right. Also relevant is the supreme court's decision in *Quarles v. French*.[4] There, the supreme court held that grandparents who have stood in loco parentis[5] are entitled to intervene in adoption cases involving their grandchildren for the limited purpose of offering such evidence as may be relevant to the focal issue of whether the proposed adoption is in the best interest of the children.[6]

■ Here, the court denied the Pippinger's motion to strike Benson and Blasingame's pleading, and it consolidated the actions for the purpose of hearing evidence. While there was no discussion at trial regarding whether Benson and Blasingame stood in loco parentis to J.P., we find on de novo review that Benson and Blasingame stood in loco parentis to J.P., based upon Blasingame's testimony that J.P. spent ninety percent of his time in her residence during the first thirteen months of his life. (Because the court explicitly found Benson and Blasingame more credible than the Pippingers on any matter where the testimony was contradictory, we rely on this testimony rather than Derek's testimony regarding how often J.P. stayed with Blasingame.) Under *Quarles*, Benson and Blasingame had a right to present evidence related to what was in J.P.'s best interest.

1. *See* Ark.Code Ann. § 9–9–212(f) (Repl.2009) ("When one (1) parent of a child or children is deceased, and the parent-child relationship has not been eliminated at the time of death, and adoption proceedings are instituted subsequent to such decease, the parents of the deceased parent shall be notified under the procedures prescribed in this subchapter of such adoption proceedings, except when the surviving parent-child relationship has been terminated pursuant to § 9–27–341.").

2. 341 Ark. 949, 20 S.W.3d 385 (2000).

3. Citing *Dougan v. Gray*, 318 Ark. 6, 884 S.W.2d 239 (1994); *Swaffar v. Swaffar*, 309 Ark. 73, 827 S.W.2d 140 (1992).

4. 272 Ark. 51, 611 S.W.2d 757 (1981).

5. "In loco parentis" means "in place of a parent; instead of a parent; charged factiously with a parent's rights, duties, and responsibilities." *Standridge v. Standridge*, 304 Ark. 364, 803 S.W.2d 496 (1991) (citing *Black's Law Dictionary* (5th ed.1979)). *See also Black's Law Dictionary* (8th ed.2004) (defining "in loco parentis" as "Of, relating to, or acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent.").

6. *See also Henry v. Buchanan*, 364 Ark. 485, 221 S.W.3d 346 (2006).

■ We recognize the Pippingers' argument that any rights to notice conferred to grandparents under the adoption statutes do not extend to great-grandparents. Given our obligation to strictly construe the adoption statutes and the fact that the notice statute does not mention great-grandparents, we must agree. But Benson and Blasingame's right to be heard is not derived from Benson's statutory right to notice. Rather, it is because they stood in loco parentis to J.P. that they have a right to present evidence. The fact that the adoption statutes do not extend a right of notice to Blasingame is of no consequence here.

In short, we conclude that Benson and Blasingame had a right to be heard on Andrea's adoption petition. We affirm on this point.

### Benson and Blasingame's Motion for Grandparent Visitation

Next, the Pippinger's argue that the circuit court should not have granted Benson and Blasingame's request for visitation. The Pippingers acknowledge their strained relationship with Benson and Blasingame, but they argue that the circuit court should have accepted Derek's reasons for restricting visitation and his testimony that he intended to increase visitation as J.P. became older. They also assert that the circuit court erred in awarding visitation in light of the fact that Derek merely

limited, not eliminated, visitation with Benson and Blasingame.

■ |_9We review domestic-relations proceedings, such as visitation requests, de novo on the record.[7] In reviewing the circuit court's order, we give deference to the circuit court's findings and review those findings under the clearly erroneous standard (not reversing them unless we are left with a definite and firm conviction that a mistake has been made).[8] This deference is even greater in cases involving children, as a heavier burden is placed on the judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children.[9] When setting visitation is at issue, we will not reverse the circuit court's decision absent an abuse of discretion (discretion that applied thoughtlessly, without due consideration, or improvidently).[10]

■■ Grandparent visitation is dictated by Arkansas Code Annotated section 9–13–103 (Repl.2009). This statute applies equally to great-grandparents,[11] but for the sake of clarity, we will simply refer to them as grandparents' rights. Grandparent visitation is a statutory created right and in derogation of common law; therefore, we must strictly construe the statute.[12]

■ Benson and Blasingame have standing to petition for visitation because the marriage of |_10J.P.'s parents ended due to Angela's death.[13] Under the statute,

7. *Neel v. Harrison*, 93 Ark.App. 424, 220 S.W.3d 251 (2005); *Grant v. Richardson*, 2009 Ark. App. 187, 300 S.W.3d 499.

8. *Ray v. Sellers*, 82 Ark.App. 530, 120 S.W.3d 134 (2003).

9. *Grant v. Richardson*, 2009 Ark. App. 187, 300 S.W.3d 499; *Hunter v. Haunert*, 101 Ark. App. 93, 270 S.W.3d 339 (2007).

10. *Oldham v. Morgan*, 372 Ark. 159, 271 S.W.3d 507 (2008); *Grant, supra*.

11. *See* Ark.Code Ann. § 9–13–103(a)(1), (b).

12. *Recinos v. Zelk*, 369 Ark. 7, 250 S.W.3d 221 (2007).

13. *See* Ark.Code Ann. § 9–13–103(b)(1) (allowing a grandparent to petition for reasonable visitation rights with his or her grandchild if the marital relationship between the parents of the child ended by death, divorce, or legal separation).

there was a rebuttable presumption that Derek's decision limiting visitation to Benson and Blasingame was in J.P.'s best interest.[14] To rebut this presumption, Benson and Blasingame had to prove by a preponderance of the evidence that they had established a significant and viable relationship with J.P. and that visitation with J.P. was in his best interest.[15] There can be no question that Benson and Blasingame had a significant and viable relationship with the child.[16] Again, Benson and Blasingame stated that J.P. spent ninety percent of his time with them during the first year of his life, and the circuit court found this testimony to be credible. Therefore, the primary issue is whether visitation with Benson and Blasingame was in J.P.'s best interest.

To prove that visitation with Benson and Blasingame was in J.P.'s best interests, Benson and Blasingame had to show (1) that they have the capacity to give J.P. love, affection, and guidance, (2) that the loss of the relationship between them and J.P. would likely cause harm to J.P., and (3) that they are willing to cooperate with Derek if visitation is allowed.[17] Two of these elements are beyond question. There was no dispute that Benson and Blasingame were capable of providing love, affection, and guidance to J.P. There is clearly animosity between the grandparents and Derek, but there is nothing in the record to show that this took away from their ability to provide love, affection, and guidance to J.P. And the record unquestionably supports a finding that Benson and Blasingame are willing to cooperate with Derek. Throughout their testimony,

they stated that they were willing to comply with any instruction given to it by the circuit court. The big question is whether the loss of the relationship would cause J.P. harm.

Regarding this element of the statute, the circuit court found that Derek's concerns were speculative and did not match his history of actions concerning Benson and Blasingame. It was suspicious of the fact that Derek's concern did not arise until the November 2008 argument with Benson. It also found that Derek's actions were not conducive to maintaining a significant relationship with Benson and Blasingame and that the loss of that relationship would likely harm J.P. These findings are supported by the record and are not clearly erroneous.

In arguing against the visitation petition, the Pippingers rely on the supreme court's decision in *Oldham v. Morgan*[18] and our decision in *Hollingsworth v. Hollingsworth*.[19] In *Oldham*, our supreme court reversed an order granting grandparent visitation. There, the grandparents were allowed to see the grandchild as much as they wanted. The impetus for the grandparents filing the petition was to ensure that said access would continue in the future. The supreme court held that the filing of the petition was premature and that the grandparents had failed to show that the loss of the grandparent-grandchild relationship would harm the grandchild.

The Pippingers argue that *Oldham* is similar because Benson and Blasingame were already afforded visitation, just not

---

14. *See* Ark.Code Ann. § 9–13–103(c)(1).

15. *See* Ark.Code Ann. § 9–13–103(c)(2).

16. *See* Ark.Code Ann. § 9–13–103(d)(1)(C) (defining "significant and viable relationship" to include proof that they "had frequent or

regular contract with the child for at least twelve (12) consecutive months").

17. *See* Ark.Code Ann. § 9–13–103(e).

18. 372 Ark. 159, 271 S.W.3d 507 (2008).

19. 2010 Ark. App. 101, 377 S.W.3d 313.

as much as they wanted. But *Oldham* is distinguishable. There, the grandparents had unrestricted access to the child, and there was no evidence showing that this was going to change in the future. The grandparents were filing the petition "just in case." Here, the event that the grandparents feared—restricted access by the parent—was occurring.[20] Further, the grandparent-visitation statute covers "a custodian's decision *denying or limiting* visitation."[21] *Oldham* is inapplicable here.

In *Hollingsworth,* we considered a circuit court's denial of a request for grandparent visitation. There, the grandparent kept the child as opposed to the parents sending the child to daycare. At one point, however, the child's parent limited visits to just a few hours and no overnight visitation. The circuit court found that visitation had only been limited, not cut off completely; that so long as the limited visitation remained, there remained a relationship; and that as long as there was a relationship, there was no harm to the child. We found that the circuit court properly applied the statute and that the circuit court did not abuse its discretion in denying the visitation petition.

[13]*Hollingsworth* does not compel the denial of a visitation petition when the custodial parent merely limits contact between grandparent and grandchild. The fact that the circuit court did not abuse its discretion in denying grandparent visitation there does not compel us to hold that a circuit court abuses its discretion in granting a grandparent-visitation petition

in any case where there is limited visitation between grandparent and grandchild. Like most cases involving children, grandparent-visitation cases each have their own unique facts upon which each case should be decided. And as long as the circuit court does not abuse its discretion in making its decision, we will affirm that decision.

The Pippingers frame the issue as whether the circuit court could substitute its own judgment regarding whether visitation should be allowed. In making their argument, they merely cite (but do not apply) section 9–13–103. We hold that the circuit court properly applied the statute and that it did not abuse its discretion in granting grandparent visitation under the facts presented. Accordingly, we affirm on this point.

### Andrea's Petition to Adopt

Finally, the Pippingers argue that the circuit court should have granted Andrea's petition to adopt J.P. They rely on the testimony showing that Andrea would be a good mother to J.P., and they assert that any evidence of Andrea's possessive attitude comes from her desire to care for J.P.

To grant Andrea's petition to adopt J.P., the circuit court had to find by clear and [14]convincing evidence that adoption was in J.P.'s best interest.[22] We review adoption proceedings de novo.[23] We give deference to the circuit court's findings, and we do not reverse unless those findings are clearly erroneous[24] or are

---

**20.** *Compare with Grant v. Richardson,* 2009 Ark. App. 187, 300 S.W.3d 499 (affirming the grant of a grandparent-visitation petition after awarding custody of the children to the father in light of evidence showing that the grandparent-grandchild relationship would be lost if the court did not award visitation).

**21.** Ark.Code Ann. § 9–13–103(c)(1) (emphasis added).

**22.** *In re Adoption of M.K.C.,* 2009 Ark. 114, 313 S.W.3d 513; Ark.Code Ann. § 9–9–214(c) (Repl.2009).

**23.** *Neel v. Harrison,* 93 Ark.App. 424, 220 S.W.3d 251 (2005).

**24.** *Ray v. Sellers,* 82 Ark.App. 530, 120 S.W.3d 134 (2003).

clearly against the preponderance of the evidence.[25] Again, our deference is even greater in cases involving children, as a heavier burden is placed on the judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children.[26]

■ The circuit court denied Andrea's petition to adopt J.P., finding that said adoption was not currently in J.P.'s best interest. We cannot say that the finding was clearly erroneous or clearly against the preponderance of the evidence. We acknowledge that the Pippingers presented evidence to support the adoption petition. But the record also shows a lot of animosity between the Pippingers and J.P.'s maternal family. The court found that the adoption would not be conducive to fostering a relationship between J.P. and the maternal family and that the loss of that relationship would not be in J.P.'s best interest. Again, these findings are supported by the record.

Further, the circuit court was not required to accept Andrea's testimony that she would promote a relationship with Benson and Blasingame if the petition were adopted. In fact, there was some evidence that the opposite would happen (Andrea prohibiting Benson and Blasingame from visiting when she was babysitting J.P. after Angela's death; Andrea accusing Benson and Blasingame of killing Angela; Derek and Andrea becoming irritated whenever Benson and Blasingame mention Angela).

In short, the circuit court did not err in denying Andrea's petition to adopt J.P. We affirm on this point as well.

Affirmed.

ROBBINS and MARTIN, JJ., agree.

25. *Id.*

26. *Grant, supra; Hunter, supra.*