2012 Ark. App. 403

**Nicholas BOWEN, Appellant**

v.

**Letizia and David BOWEN, Appellees.**

**No. CA 11–868.**

Court of Appeals of Arkansas.

June 27, 2012.

Cecilia Ashcroft, Walthall Law Firm, P.A., Malvern, for Appellant.

Michelle M. Strause, The Farrar Firm, Hot Springs, for Appellee.

LARRY D. VAUGHT, Chief Judge.

Appellant Nicholas Bowen (Nick) argues on appeal that the circuit court erred in granting his parents, appellees Letizia and David Bowen, visitation with their grandchildren (Alex, age twelve and Kate, age ten) under Arkansas's grandparent-visitation statute. Specifically, he claims that there was insufficient evidence to support the trial court's conclusion that the court-ordered grandparent visitation was in his children's best interest. We agree and reverse.

Nick Bowen and Helene Wade divorced in 2005, and they were awarded joint custody of their two minor children—with Nick having custody in the summer and Helene having custody during the school year. The following year, the parties entered into an agreement in which they alternated care of the children on a weekly basis. In 2010, Nick and Helene agreed to homeschool their children in Nick's home.

Nick's current wife, Amy ⌊₂Bowen, homeschooled the kids with the assistance of their mother, Helene.

In September 2010, Nick petitioned for ex parte drug testing and immediate custody of the children based on Helene's drug use. After Helene tested positive for illegal substances, the court awarded Nick sole custody of the minor children and visitation to Helene. The trial court also allowed Nick's parents, Letizia and David, to intervene and seek grandparent visitation in the underlying domestic-relations case between Nick and Helene.

The trial court set the hearing on grandparent visitation for April 2011 and ultimately ordered that Letizia and David receive visitation with their grandchildren, one weekend per month with extended time during the summer and holidays. The court further ordered that this time be taken from Nick's time with his children. It is from this order that Nick appeals.

■ We review domestic-relations proceedings, such as visitation requests, de novo on the record. *Pippinger v. Benson*, 2011 Ark. App. 442, at 9–13, 384 S.W.3d 614. In reviewing the circuit court's order, we give deference to the circuit court's findings and review those findings under the clearly erroneous standard, and we will not reverse unless we are left with a definite and firm conviction that a mistake has been made. *Id.* This deference is even greater in cases involving children, as a heavier burden is placed on the judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.* at 12. Further, when visitation is at issue, we will not reverse the circuit court's decision absent an abuse of discretion. *Oldham v. Morgan*, 372 Ark. 159, 271 S.W.3d 507 (2008).

■ Grandparent visitation is governed by Arkansas Code Annotated section 9–13–103 ⌊₃(Repl.2009). Grandparent visitation is a statutorily created right and in derogation of common law; therefore, we must strictly construe the statute. Ark. Code Ann. § 9–13–103. Specifically, our statute states, in pertinent part:

(b) A grandparent or great-grandparent may petition a circuit court of this state for reasonable visitation rights with respect to his or her grandchild or grandchildren or great-grandchild or great-grandchildren under this section if:

(1) The marital relationship between the parents of the child has been severed by death, divorce, or legal separation;

. . .

(c)(1) There is a rebuttable presumption that a custodian's decision denying or limiting visitation to the petitioner is in the best interest of the child.

(2) To rebut the presumption, the petitioner must prove by a preponderance of the evidence the following:

(A) The petitioner has established a significant and viable relationship with the child for whom he or she is requesting visitation; and

(B) Visitation with the petitioner is in the best interest of the child.

(d) To establish a significant and viable relationship with the child, the petitioner must prove by a preponderance of the evidence the following:

(1)(A) The child resided with the petitioner for at least six (6) consecutive months with or without the current custodian present;

(B) The petitioner was the caregiver to the child on a regular basis for at least six (6) consecutive months; or

(C) The petitioner had frequent or regular contact with the child for at least twelve (12) consecutive months; or

(2) Any other facts that establish that the loss of the relationship between the petitioner and the child is likely to harm the child.

(e) To establish that visitation with the petitioner is in the best interest of the child, the petitioner must prove by a preponderance of the evidence the following:

(1) The petitioner has the capacity to give the child love, affection, and guidance;

(2) The loss of the relationship between the petitioner and the child is likely to harm the child; and

(3) The petitioner is willing to cooperate with the custodian if visitation with the child is allowed.

Ark.Code Ann. § 9–13–103(b)–(e).

Here, Letizia and David have standing to petition for visitation because the marriage of the grandchildren's parents ended by divorce in 2005.[1] We note that the rationale behind Arkansas's requirement that the marriage be severed before giving grandparents standing to seek visitation must (at least in great part) be in response to a concern that the custodial parent's judgment may contain animosity toward the noncustodial parent and/or the grandparents as a result of the divorce. And, with an intact marriage, the grandparents have a greater "voice" in this situation because their own child is a player in the parenting paradigm. Uniquely, we note that in this case the increased amount of visitation that Letizia and David sought (and were denied) was exclusively at their *own son's* discretion.

Under the statute, there is a rebuttable presumption that Nick's decision to limit the time his children spent with his parents was in his children's best interest. Ark.Code Ann. § 9–13–103(c)(1). To re-

but this presumption, Letizia and David were first required to prove by a preponderance of the evidence that they had established a significant and viable relationship with the children. Ark.Code Ann. § 9–13–103(c)(2)(A). The parties agreed that, prior to the divorce, in the early years of the children's lives, they were with Nick's parents a great deal. Letizia and David took the children on trips, babysat them, and assisted in transporting them to various activities and events. And, as the trial court found, after the parties' relationship became strained, the grandparents went "beyond the call of duty" to see the children at school. In fact, there is no question that the evidence supports a conclusion that Letizia and David had a significant and viable relationship with the children. Therefore, the primary issue we are concerned with on appeal is whether visitation with Letizia and David was in the children's best interest.

To prove that visitation with Letizia and David was in Alex's and Kate's best interests, the grandparents had to show (1) that they have the capacity to give the children love, affection, and guidance, (2) that the loss of the relationship between them and their grandchildren would likely cause harm to the grandchildren, and (3) that they are willing to cooperate with their son if visitation is allowed. *In re Adoption of J.P.*, 2011 Ark. 535, 385 S.W.3d. 266. Two of these elements are beyond question. There is no dispute that Letizia and David are capable of providing love, affection, and guidance toward Alex and Kate. There is clearly animosity between the grandparents and their son, but there is nothing in the record to show that this took away from their ability to provide love, affection, and guidance to the grandchildren. The record also unquestionably

1. At the time of the divorce, Alex was six years old, and Kate was four years old.

supports the finding that Letizia and David are willing to cooperate with Nick if visitation is allowed. Throughout their testimony, the grandparents stated that they would comply with any instruction given to them by the circuit court. Therefore, the question before us now is very narrowly set out. We must consider whether Letizia and David adequately carried their burden of showing that the relationship between them and their grandchildren had been lost and that the loss of the relationship would likely cause harm to Alex and Kate. Ark.Code Ann. § 9–13–103(e)(1–3).

On appeal, Nick first contests the trial court's finding that Letizia and David had "been effectively denied reasonable visitation with the minor children." Nick relies on the supreme court's decision in *Oldham*, 372 Ark. at 159, 271 S.W.3d at 507. In *Oldham*, our supreme court reversed an order granting grandparent visitation. There, the grandparents were allowed to see the grandchild as much as they wanted. The impetus for the grandparents' filing the petition was to ensure that said access would continue in the future. The supreme court held that the filing of the petition was premature and that the grandparents had failed to show that the loss of the grandparent-grandchild relationship would harm the grandchild. *Id.*, 372 Ark. at 165, 271 S.W.3d at 510–12.

Here, the evidence showed that, after the divorce, Nick's relationship with his father deteriorated. The record establishes that Nick was fired by his father's plumbing company; Nick later married Amy; he distanced himself from his parents; and he and his parents only had contact while attending family events or the children's activities. However, the evidence also shows that at no time during the strained relationship were Nick's parents completely denied contact with the children. According to the evidence introduced at trial, the grandparents eventually settled into a weekly visit with the children during the children's school lunch hour. This continued for a five-year period, with the grandparents neither asking for nor receiving additional visitation. However, in 2010, when the decision was made to begin homeschooling the children, the grandparents were no longer able to see the children at school during lunch. In response, Letizia and David petitioned the court for grandparent visitation.

According to the record, although the grandparents were receiving visitation at the time they filed their petition (and more so after the filing), it was extremely limited.[2] There was also testimony that Nick intended to phase his parents out of the children's lives. Nick testified that he limited his parents' relationship with his children because he had a strained relationship with his parents; he felt that his parents often interfered with his parenting decisions; and his mother was in the habit of planning and programming the children's time every weekend that his children were in his care.

As Letizia and David note in their brief, Nick said that he wants his children to have a relationship with their grandparents, "but will only do so under his terms." Based on the record before us, we are satisfied that there is sufficient evidence to support the trial court's conclusion that Nick "effectively" denied his parents visitation, which—absent a showing that the denial would harm the children—he was

---

2. In 2011, the grandparents received a single visit in February for a Christmas-gift exchange; two visits in March, one for a Mc-Donald's lunch and another for an overnight event; and a single visit in April at their home.

well within his rights as the children's sole custodial parent to do.

The trial court found that "by virtue of denying the children contact with their paternal grandparents, terrible harm is occurring to these children." In support of this conclusion, the trial court noted that the children benefited from visits with their grandparents and that they were provided "an opportunity to travel" and "gain advice from respected family members." The trial court also found that the children will be smarter and enriched if they engaged in travel during their lives. However, there was no evidence showing that the inverse will occur if the children did not frequently visit their grandparents. The record is completely void of any proof showing the children had been, or likely would be, harmed without court-mandated visitation with their grandparents.

Our statute not only has a presumption in the favor of the custodial parent—giving the parent's decision presumptive or special weight in deciding whether grandparent visitation is in the best interest of the child—the statute also requires the existence of a substantial relationship between grandchild and grandparent before the grandparent has standing to petition the court for visitation. Requiring a "substantial relationship" implies that grandparent visitation is not accepted as being beneficial, per se. And, more important, a substantial relationship does not necessarily mean the child is harmed if visitation is denied. In fact, in order to overcome the presumption that a fit parent is necessarily acting in his children's best interest, our statute requires both a showing of a substantial grandparent-grandchild relationship, *and* a showing that a denial of that relationship "is likely to harm the child."

In this case, the reality remains that for the five years immediately preceding Letizia and David's filing of their grandparent-visitation petition the children had only seen their grandparents on a limited basis—once a week, at lunch, during the school year. While there is no doubt that these short visits were enjoyable and perhaps even beneficial to the children, there is a substantial difference between the existence of a relationship benefiting a child and the denial of that relationship harming a child.

In formulating the threshold of proof required to show harm under Arkansas's grandparent-visitation statute, we look to other jurisdictions with similar statutory requirements. In *Moriarty v. Bradt*, the Supreme Court of New Jersey examined a visitation dispute under the harm standard. 177 N.J. 84, 827 A.2d 203, 205–29 (2003) (requiring a showing of harm to the child before the court will consider awarding visitation rights). In *Moriarty*, the parents divorced and remarried other people, but the children continued to spend a lot of time with the maternal grandparents. *Id.* The children's mother later died of a drug overdose, and the father greatly limited visitation with the maternal grandparents because he blamed them for his ex-wife's drug addiction. *Id.* The court explained that the grandparents must demonstrate harm to the children absent visitation with them, at which point the court would then consider what was in the children's best interests. *Id.* at 205–29.

The New Jersey court found that denying the grandparents visitation rights would harm the children because the children previously had a very close relationship with the grandparents, and they had no other way to stay connected to the memory of their mother. *Id.* at 223–27. The grandparents presented expert testimony that the children were devastated by the death of their mother and that abruptly ending visitation with the grandparents would cause severe psychological damage

to the children. *Id.* at 227. The grandparents further argued that, in their absence, the father might disparage the mother to the children, and therefore the children's only source of information about their mother would portray her as "evil." *Id.* at 227. The court upheld the visitation order, but in doing so, set a very high bar of what constitutes "harm" to the child—the lack of connection with a deceased parent and the consequent risk that the children will suffer psychologically. *Id.* at 205–29.

Likewise, in *Luke v. Luke*, 280 Ga.App. 607, 634 S.E.2d 439, 440–42 (2006), the court considered what showing of harm is required to support an award of grandparent visitation. In *Luke,* the children's mother and father divorced, but continued to allow visitation with all grandparents. *Luke,* 634 S.E.2d at 440–42. The children spent every other weekend with their paternal grandparents, developing a very close bond. *Id.* at 440–42. When the children's father went overseas on military duty, the mother sought to limit the paternal grandparents' visitation. *Id.* at 440–42. The mother believed that the grandparents "shuffled" the children around too much, that the children returned from visits emotionally distressed, and that the grandmother may have slapped one of the children. *Id.* at 442.

The Georgia court found that the denial of visitation would cause harm to the children and awarded visitation rights to the paternal grandparents. *Id.* at 442. The grandparents explained that "with the children's father now serving with the U.S. Army, the children's ties with their paternal family would be virtually destroyed without such visitation." *Id.* at 442. Further, the grandparents had developed such an intense bond with the grandchildren that cutting off visitation with the grandparents would cause the children "actual emotional harm." *Id.* at 441–42. The harm in this case was the sudden termination of a strong, personal relationship and the threat of the children losing their memory of a parent.

Like New Jersey and Georgia—by requiring a grandparent to show that the child is likely to suffer actual harm if the requested visitation is denied—Arkansas recognizes in its grandparent-visitation statute recognizes that the right to care for and raise one's own child is a fundamental liberty interest that is protected by the Due Process Clause of the Fourteenth Amendment. *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion) (finding statute that allowed visitation by third parties based solely on a best-interest standard unconstitutional); *Linder v. Linder,* 348 Ark. 322, 342, 72 S.W.3d 841, 851 (2002). And, as recently as last month, our supreme court has reaffirmed the manifest primacy of the parent-child relationship first set out by the Supreme Court in *Troxel* and later adopted by Arkansas in the *Linder* opinion:

> [T]he interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, ... we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, ... we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained ... that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for

additional obligations." We returned to the subject ..., and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

*In re Guardianship of S.H.,* 2012 Ark. 245, 9–10, 409 S.W.3d 307 (quoting *Troxel,* 530 U.S. at 65–66, 120 S.Ct. 2054) (internal citations omitted). In recognition of this well-established fundamental right to parent, our grandparent-visitation statute was designed to limit a trial court's discretion under the best-interest standard in order to prevent unconstitutional governmental intrusion in the parent-child relationship. Ark.Code Ann. § 9–13–103.

In order to comply with the strictures of the statute, the burden is firmly placed on the grandparents to prove visitation is in the grandchild's best interest. This best interest of the child cannot be proved simply by showing that a meaningful or substantial relationship existed and the grandparents desired to further that relationship. Furthermore, a trial court cannot override a fit parent's wishes based solely on its personal view of the children's best interests. *In re Guardianship of S.H.,* 2012 Ark. at 9–15, 409 S.W.3d at 313–17.

In this case, the trial court substituted a benefit analysis for our required statutory presumption in favor of the parent's decision. In so doing, the trial court basically required Nick to prove that visitation would be harmful, losing sight of the fact that it is the *parent* who has a right to uninterrupted custody. Instead, the court should have required that Letizia and David show (1) that Nick's requiring the visitation to be "on his terms" or be effectively denied would likely harm the grandchildren and (2) that granting visitation was necessary to remedy this harm. Because these burdens were neither required by the trial court nor met by the petitioners in this case, we reverse the decision of the trial court.

Reversed.

PITTMAN, MARTIN, and HOOFMAN, JJ., agree.

ABRAMSON and BROWN, JJ., dissent.

BROWN, J., dissenting.

I must respectfully dissent from the majority holding in this case.

The majority notes that grandparents only have standing under the statute to seek visitation if the marriage of the parents has been severed. The majority then speculates that this requirement "must (at least in great part) be in response" to a concern that the custodial parent might bear animosity toward the noncustodial parent and/or grandparents, whereas when the marriage is intact, "the grandparents have a greater 'voice' in the situation because their own child is a player in the parenting paradigm." The majority then observes that "in this case the increased amount of visitation that Letizia and David sought (and were denied) was exclusively at their *own son's* discretion." (Emphasis in original.) This would seem to suggest that because the appellees were being denied access to the grandchildren by their own son, the statute does not apply to them, or that their standing is somehow diminished. There is no basis for that in the text of the statute, nor has the majority cited any other authority to support such a conclusion or suggestion. In fact, a strict construction of the text of the statute indicates the opposite, as it specifically provides that when visitation is granted by a court, "the visits may occur without regard to which parent has physi-

cal custody of the child." [1] Additionally, the statute specifically gives standing to both maternal and paternal grandparents of illegitimate children, without reference to whether the grandparent is related to the custodial parent.[2] Grandparent visitation is a statutorily created right and in derogation of ⌞14⌟common law; therefore, we must strictly construe the statute.[3] The statute is neutral with regard to the relationship of the grandparents to the parent restricting visitation, and should be applied in a neutral fashion.

As the majority acknowledges, there is no dispute that the only issue before us is whether appellees met the statutory requirement to show that the loss of the relationship between them and their grandchildren was likely to harm the children; the statute does not require a showing of actual harm. It is undisputed, either in the record below or by this court on appeal, that appellees had a significant and viable relationship with their grandchildren, that the relationship was beneficial to the children and in their best interest,[4] and that the relationship had been effectively denied by appellant. However, the majority asserts, "There is a substantial difference between a relationship benefiting a child and the denial of [that] relationship harming a child."

The reasoning behind identifying such a "substantial difference" is anything but clear. How can one rationally say that the loss of a beneficial, loving, and significant relationship with a grandparent is not harmful, or at least evidence of likely harm? To say otherwise is contrary to all logic and reason, not to mention human experience and common sense. The harm is that the Bowen children have been denied a benefit they once enjoyed. At the very ⌞15⌟least, the denial of such a benefit constitutes evidence of likely harm—which is all the statute expressly requires—and provides a basis for the circuit court's ruling. If, as the majority contends, the legislature intended to set a higher burden of proof on the element of likely harm, that intent was expressed nowhere in the statute. It is the function of the General Assembly, not this court, to impose more strenuous requirements or provide any missing clarity.[5]

The circuit court in this case, after evaluating the witnesses and their testimony, found that it was in the best interest of the Bowen children to order visitation with their grandparents, so that the children could once again enjoy the benefits of that relationship. Based on the evidence presented and the deference with which we are required to treat the circuit court's findings of fact and credibility, I cannot see how the court's grant of visitation can be deemed an abuse of discretion.

1. Ark.Code Ann. § 9–13–103(f)(2)(A) (Repl. 2009).

2. Ark.Code Ann. § 9–13–103(b)(2), (3).

3. *Pippinger v. Benson,* 2011 Ark. App. 442, 384 S.W.3d 614 (citing *Recinos v. Zelk,* 369 Ark. 7, 250 S.W.3d 221 (2007)), *vacated on other grounds by In re Adoption of J.P.,* 2011 Ark. 535, 385 S.W.3d 266.

4. Appellant even testified that, in his opinion, it was in his children's best interest to have a relationship with his parents.

5. *McMillan v. Live Nation Entm't, Inc.,* 2012 Ark. 166, 401 S.W.3d 473 (citing *Oldham v. Morgan,* 372 Ark. 159, 271 S.W.3d 507 (2008) (acknowledging that the General Assembly, not the court, has the function of offering task of rewriting statutes to the General Assembly)). In *McMillan,* our supreme court stated that it "will not by judicial fiat amend the statute to address concerns that are properly the province of the General Assembly. It is the function of the General Assembly to offer remedial legislation to address perceived statutory inadequacies." 2012 Ark. 166, at 6, 401 S.W.3d 473.

In fact, the majority opinion is ambiguous as to which standard of review was applied to the ruling and findings of the circuit court. The opinion states first that the clearly erroneous standard applies in visitation cases, then says that when visitation is at issue, the circuit court's decision will not be reversed absent an abuse of discretion. The remainder of the opinion does not clarify whether the circuit court is being reversed because the majority was "left with a definite and firm conviction that a mistake has been made"[6] or because the circuit court applied its discretion "thoughtlessly, without due consideration, or improvidently."[7] It is of paramount importance that this court not only keep a standard of review firmly in mind when addressing the merits of a case, but that future litigants, their attorneys, and circuit courts are given clear notice as to what standard of review will govern their cases on appeal.

Further regarding the proper scope of this court's review, I note that the majority's opinion focuses on parental rights, when the polestar for making judicial determinations concerning visitation is supposed to be the best interest of the *child*.[8] In cases involving child visitation or custody, this court is required to show an exceptionally high degree of deference to the circuit court's superior position to evaluate witnesses, their testimony, and the best interest of the child.[9] I do not believe that the majority has given the proper deference to the circuit court's broad discretion to weigh conflicting testimony and determine the best interest of the children, which the record in this case makes clear was the basis of the circuit court's ruling.

The majority opinion cites the recent case of *In re Guardianship of S.H.*[10] in support of the proposition that "a trial court cannot override a fit parent's wishes based solely on its personal view of the children's best interests." To the extent this insinuates that the circuit court exercised personal rather than professional judgment, there is no evidence of that in the record. Moreover, *S.H.* is so different from this case as to be inapposite. *S.H.* involved a mother's effort to terminate the grandparents' permanent guardianship of her daughter—that is, the question of whether she would have any parenting role at all. Furthermore, *S.H.* was taken up by our supreme court specifically to address the constitutionality of a guardianship-termination statute. No such question is before this court. Contrary to what the majority opinion suggests, *S.H.* does not operate to limit the discretion of the circuit court to determine the best interest of the child in visitation cases. Instead of adhering to the applicable standard of review, the majority has chosen to focus on a discussion of parents' constitutional rights, which is improper since no constitutional question was raised for this court to consider. Regrettably, the best interest of the children in this case—which the statute clearly prioritizes and which the circuit court was in a far better position to determine—seems to have been lost in the shuffle.

ABRAMSON, J., joins in this dissent.

---

6. *See, e.g., Reed v. Ark. Dep't of Human Servs.,* 2012 Ark. App. 369, 417 S.W.3d 736 (stating the "clearly erroneous" standard of review).

7. *Oldham v. Morgan, supra* (stating the "abuse of discretion" standard of review).

8. *Morris v. Dickerson,* 2012 Ark.App. 129, 388 S.W.3d 910 (citing *Hudson v. Kyle,* 365 Ark. 341, 229 S.W.3d 890 (2006)).

9. *Id.*

10. 2012 Ark. 245, 409 S.W.3d 307.