2012 Ark. App. 484

**Jennifer FAVANO, Appellant**

v.

**Sheila Hill ELLIOTT, Appellee.**

**No. CA 11–1173.**

Court of Appeals of Arkansas.

Sept. 12, 2012.

Karen Pope Greenaway, for appellant.

Mayo Law Offices, Bentonville, by: M. Grand Ragland, for appellee.

CLIFF HOOFMAN, Judge.

Appellant Jennifer Favano appeals from the trial court's decision granting appellee Sheila Hill Elliott's petition for grandparent visitation. On appeal, Favano argues that the trial court erred (1) by ordering visitation with Elliott where the grandmother had acted in ways that were likely to harm the child, M.F., and (2) in failing to rule on her motion for a new trial, thus denying it, where the motion included expert testimony that visitation with Elliott would harm M.F. We agree that the trial court erred by granting Elliott's petition for visitation because there was insufficient evidence presented to show that the loss of the relationship would likely cause harm to M.F.; therefore, we reverse based on the first point on appeal.

M.F.'s mother and father, Favano and Kyle Hill, were married in November 2001, and M.F. was born in May 2002. The parents divorced in July 2003, with Favano receiving custody of M.F. and Kyle receiving visitation. Favano remarried in 2005, and Kyle died in July 2008. In

May 2010, after Favano had cut off Elliott's visitation with M.F. in February 2010 due to allegations of bad judgment, Elliott filed a petition to establish grandparent's rights. A hearing was held on the petition in July 2011.

At the hearing, Favano testified that in addition to nine-year-old M.F., she also has two children with her current husband, Brandon Favano. Brandon had recently filed a petition for stepparent adoption of M.F., which was granted. Favano stated that after M.F. was born in 2002, she was employed full-time and her mother kept M.F. during the day on Tuesdays through Fridays, while Elliott watched her on Mondays. During Favano and Kyle's divorce proceedings in 2003, Elliott was appointed as the supervisor of Kyle's visitation. In addition, Favano testified that, when Kyle was on active duty in Iraq, Elliott would sometimes exercise Kyle's alternate-weekend visitation rights and would keep M.F. from Friday through Monday on those occasions. Favano stated that M.F. was between one and three years old during that time. According to Favano, Elliott regularly exercised Kyle's visitation for approximately one year after the divorce, but in 2004, Elliott told Favano that her boyfriend was smoking pot in the house while M.F. was present. Favano limited Elliott's visitation after that point and testified that Elliott only visited with M.F. on six or eight occasions, mainly on major holidays, when M.F. was between three and five years old.

After Kyle returned from Iraq, he became ill and died in July 2008. Favano testified that M.F. had no contact at all with her father or his family during the year before he died because neither Kyle nor his family initiated contact. Favano testified that she did not let M.F. attend Kyle's memorial service because she did not feel it was appropriate for a six year old who had not seen her father in over a

year. She did, however, bring M.F. to visit with Kyle's extended family shortly after the funeral. Subsequent to Kyle's death, Favano stated that Elliott requested to see M.F. on approximately six occasions from July 2008 until February 2010. Favano stated that she was present during most of these visitations and that she never allowed M.F. to stay overnight with Elliott after Kyle's death, although Elliott had requested it. In February 2010, Elliott called Favano to request another visit with M.F. and became upset on the phone, talking about how much she missed Kyle. According to Favano, during this conversation, Elliott related to her that she had let M.F. read a letter that Elliott had written, blaming Kyle's doctor for his death. Favano stated that she was shocked at this and discontinued visitation. Several months later, in November 2010, Elliott filed her petition for grandparent visitation. Favano stated that Elliott had contacted her since she filed the petition, telling her that she was sorry and requesting to see M.F., but Favano had denied her requests.

Favano testified that she considered M.F. to be a part of Kyle's family and that she had tried to do the right thing and rebuild M.F.'s relationship with Elliott after Kyle's death. She stated that Elliott loves M.F. and that she had seen her show physical affection to the child. Although Favano stated that she believed it was in M.F.'s best interest to have a relationship with Elliott, she also stated that she did not think it was in M.F.'s best interest to have court-ordered visitation due to Elliott's history of poor judgment. She stated that it was her duty as a parent to protect M.F. and that she would allow visitation with Elliott in the future if she were to exercise good judgment and if M.F. desired to have visitation. While Favano testified that she believed that M.F. loves Elliott, she stated that she did

not think M.F. would suffer harm if Elliott were not in her life. She stated that M.F. would suffer harm, however, if Elliott were allowed to come "in and out of her life," as her father had done. Favano further expressed concern over a recent hateful email from M.F.'s paternal aunt, Kathleen Hill, and she stated that Hill had also flipped her off prior to the hearing that day.

Kathleen Hill, M.F.'s aunt, testified that she had a close relationship with M.F. and that she used to see her frequently when her mother kept her when she was between one and three years old. Hill stated that she moved back to Arkansas from California after her brother, Kyle, died and that she attempted to keep an ongoing relationship with Favano so that she could visit with M.F. According to Hill, Favano would only respond to her texts and phone calls approximately thirty percent of the time, and she was only occasionally allowed to visit with M.F. Hill stated that M.F. has a loving and affectionate relationship with Elliott and that their extended family is very close. She admitted writing the hateful email to Favano but denied directing an obscene gesture toward her at the hearing.

Dennis Elliott, Sheila's husband, testified that he supported his wife's efforts to receive visitation with M.F. and that they have a very close-knit family. He denied that he had ever smoked pot in the house and claimed that he had passed previous drug tests. He stated that he had no concerns for M.F.'s welfare, safety, or happiness in their home.

Sheila Elliott testified that she kept M.F. every weekend for three years when Kyle was in Iraq. She stated that she loves M.F. and that M.F. reciprocates her displays of affection. According to Elliott, Favano had not let her keep M.F. overnight since Kyle died in 2008, and she had not seen the child since she filed the petition for visitation. In the two years prior to when she filed the petition, Elliott testified that she saw M.F. approximately ten or twelve times. She indicated that Favano would only occasionally respond to her requests for visits and that she would usually say no. Elliott stated that she tried not to be too pushy with Favano because she did not want her to take away all of her visitation. On M.F.'s last three birthdays, Elliott testified that Favano declined her requests to see the child and that she had to drop off the presents at the doorstep. Elliott denied letting M.F. read the letter that blamed Kyle's doctor for his death, claiming that she would never do that, although she stated that it was possible that the child had found the letter in the backseat of her car and read it on her own. According to Elliott, she has a close relationship with M.F. and believes it would be in the child's best interest to have a relationship with her father's family. She testified that M.F. would have an emotional void without this relationship. Although Favano had not been cooperative with Elliott regarding visitation with M.F. in the past, Elliott stated that she does get along well with Favano and that the rest of her family does as well.

Janice Hill, Sheila Elliott's mother, testified that she lives in California but that she had contact with M.F. when she returned to Arkansas for visits. In the past four or five years, Janice stated that she had seen M.F. ten or twelve times. According to Janice, M.F. loves her grandmother and sometimes does not want to return home after her visits. She could think of no reason why the child should not be permitted to visit with Elliott. Although she believed that Favano was a good parent, Janice stated that Favano's decision to prohibit visitation was emotionally harmful to M.F. While Janice agreed that Elliott's contact with M.F. had

been sporadic, she testified that this was due to Favano, not Elliott.

For the respondents, Patricia Dell, Favano's mother, testified. She denied that Elliott kept M.F. every weekend following her parent's divorce, stating that Elliott had her on weekends only when she chose to exercise Kyle's visitation rights. She also testified that she did not know of any contact that Elliott had with M.F. in the year before Kyle's death.

Favano was then recalled to the stand. She reiterated that court-ordered visitation was not in M.F.'s best interest and stated that there was no evidence that M.F. was being harmed from the recent lack of contact with Elliott and her family. Favano felt that the inconsistency of Elliott's contact with M.F. in the past was actually more harmful to her. She testified that if M.F. asked to see her father's extended family in the future, then she would not deny visitation.

Brandon Favano, M.F.'s adoptive father, testified that he agreed with his wife that it was not in M.F.'s best interest to have court-ordered visitation and that his wife would absolutely do the right thing if M.F. were to desire contact with Elliott in the future. When he and M.F. ran into Elliott at the mall during Christmas, Brandon stated that M.F. acted "standoffish" and reserved because she had not seen Elliott in a long time. According to Brandon, M.F. did not currently have any interest in visiting Elliott, and after Kyle passed away, she asked if she had to visit with her anymore. He testified that he had not discussed the current court proceedings with M.F. He also disagreed with his wife that it was in M.F.'s best interest to have a relationship with Elliott and her extended family, due to the lack of stability and previous inappropriate behavior on their part.

Following the hearing, the trial court ruled that Elliott had met her burden to prove that court-ordered visitation was in M.F.'s best interest and that a significant relationship had been established between them. The court entered an order on August 8, 2011, allowing visitation on one weekend a month, as well as summer and holiday visitation.

On August 17, 2011, Favano filed a motion for new trial, for a stay of visitation order, and for an expedited hearing. Favano alleged that since the hearing, she had informed M.F. that she was required to have weekend visits with Elliott and that M.F. had a significant change in her attitude and demeanor. Favano took her to three visits with a counselor and attached the counselor's affidavit to her motion. This affidavit stated that M.F. did not remember her father, Kyle, and considered Brandon to be her father; that she did remember visiting Elliott; that Elliott would become angry at her if she did not call her "grandma" or if she called Brandon "dad"; that Elliott was impatient and would yell at her; that Elliott would constantly talk about Kyle to her and show her pictures, and would become angry if she did not share her interest in him; that she does not want to visit with Elliott because she is like a stranger to her; and that she especially does not want to spend an entire weekend with Elliott because she will feel pressured and uncomfortable. The counselor stated that there did not seem to be a bond between Elliott and M.F. and that court-ordered weekend visitation would cause emotional and psychological stress to the child. Favano's motion for new trial was deemed denied after thirty days, and Favano filed a timely notice of appeal from this denial, as well as from the entry of the visitation order.

The main consideration in making judicial determinations concerning visitation is the best interest of the child, and we will not reverse a finding by a circuit

court in an equity case unless it is clearly erroneous. *In re Adoption of J.P.*, 2011 Ark. 535, 385 S.W.3d 266. A finding of fact is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* We also give due deference to the superior position of the trial court to view and judge the credibility of the witnesses, and this deference is even greater in cases involving child custody or visitation, as a heavier burden is placed on the trial court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Bethany v. Jones*, 2011 Ark. 67, 378 S.W.3d 731.

██ According to the relevant provisions of Ark.Code Ann. § 9–13–103 (Repl. 2009), once a grandparent petitions the trial court for reasonable visitation with his or her grandchild,

(c)(1) There is a rebuttable presumption that a custodian's decision denying or limiting visitation to the petitioner is in the best interest of the child.

(2) To rebut the presumption, the petitioner must prove by a preponderance of the evidence the following:

(A) The petitioner has established a significant and viable relationship with the child for whom he or she is requesting visitation; and

(B) Visitation with the petitioner is in the best interest of the child.

(d) To establish a significant and viable relationship with the child, the petitioner must prove by a preponderance of the evidence the following:

(1)(A) The child resided with the petitioner for at least six (6) consecutive months with or without the current custodian present;

(B) The petitioner was the caregiver to the child on a regular basis for at least six (6) consecutive months; or

(C) The petitioner had frequent or regular contact with the child for at least twelve

(12) consecutive months; or

(2) Any other facts that establish that the loss of the relationship between the petitioner and the child is likely to harm the child.

(e) To establish that visitation with the petitioner is in the best interest of the child, the petitioner must prove by a preponderance of the evidence the following:

(1) The petitioner has the capacity to give the child love, affection, and guidance;

(2) The loss of the relationship between the petitioner and the child is likely to harm the child; and

(3) The petitioner is willing to cooperate with the custodian if visitation with the child is allowed.

This statute is strictly construed, as it is in derogation of, or at variance with, common law. *Oldham v. Morgan*, 372 Ark. 159, 271 S.W.3d 507 (2008).

██ Favano first argues that the trial court's order granting Elliott visitation is clearly erroneous because there was insufficient proof that Elliott established a significant and viable relationship with M.F. However, the undisputed evidence showed that Elliott had regular contact with M.F. from the time she was approximately eight months old until she was between three and four years old. While there was some dispute as to how often Elliott exercised Kyle's visitation during this period of time, she did regularly care for the child for several days at a time for more than twelve months. This satisfies the statutory requirement that a significant and via-

ble relationship between the grandparent and grandchild be shown. Ark.Code Ann. § 9–13–103(d)(1)(C).

We do, however, find merit to Favano's contention that the trial court clearly erred in finding that Elliott had met her burden of showing that visitation was in M.F.'s best interest. In finding that this statutory requirement had been established, the trial court relied solely on Favano's own testimony that she believed a relationship with Kyle's family was in M.F.'s best interest. Specifically, the trial court stated, "Mrs. Favano has said she believed it to be in M.F.'s best interest to have a relationship with the Plaintiff, which would be, of course, her father's extended family. So, that hurdle has been met."

The grandparent-visitation statute requires that three separate elements must be proved by a preponderance of the evidence to establish that court-ordered visitation is in the child's best interest: (1) the petitioner has the capacity to give the child love, affection, and guidance; (2) the loss of the relationship between the petitioner and the child is likely to harm the child; and (3) the petitioner is willing to cooperate with the custodian if visitation with the child is allowed. Ark.Code Ann. § 9–13–103(e)(1)–(3). Favano does not contend on appeal that Elliott failed to prove elements (1) and (3), and we agree that there was sufficient evidence for the trial court to find that Elliott had the capacity to give M.F. love, affection, and guidance and that she would be willing to cooperate with Favano on visitation.

Thus, the primary issue here is whether Elliott met her burden of proving that the loss of the relationship between her and M.F. was likely to harm the child. Favano argues that there was insufficient evidence presented to establish this element of the statute, and we agree. The trial court's finding that the best interest "hurdle" was met solely by Favano's own testimony is clearly erroneous, as this testimony did not relieve the trial court of its duty to find that all three statutory elements of best interest, including the harm element, had been proved by Elliott. Though Favano did testify that a relationship with Elliott was in her daughter's best interest, she also qualified this statement and further explained that court-ordered visitation was not in M.F.'s best interest. The court's ruling did not state what harm would likely be suffered by M.F. if the relationship with her grandmother was lost, and there was not sufficient evidence presented by Elliott to satisfy her burden of proving this particular element. To the contrary, Favano testified at the hearing that, even though M.F. had not had visitation with Elliott in more than one year, she was currently doing "awesome." Favano specifically stated that she saw no evidence that M.F. was suffering harm from the recent lack of a relationship with Elliott and in fact argued that court-ordered visitation was ill-advised and even harmful due to Elliott's lack of judgment in the past. In addition, M.F.'s adoptive father, Brandon, testified that he and M.F. had recently run into Elliott at the mall and that M.F. acted "standoffish" and reserved toward her grandmother. He stated that M.F. had no interest in visiting Elliott and her extended family and that M.F. had previously asked if she had to go and visit them.

In another recent case involving grandparent visitation, we reversed the trial court's award of visitation due to the lack of evidence that harm to the children would likely result from the loss of a relationship with their grandparents. *Bowen v. Bowen*, 2012 Ark. App. 403, 421 S.W.3d 339. Despite the trial court's finding that harm would occur to the children without court-mandated visitation, we held that the record was completely void of evidence to

support such a finding. *Id.* We noted that the grandparent-visitation statute requires proof of both a substantial relationship and that visitation is in the best interest of the child, and we further stated there is a substantial difference between a relationship benefitting a child and the denial of that relationship harming the child. *Id.* Because a parent is presumed to act in the best interest of his or her child, and the grandparent-visitation statute is in derogation of that presumption, the statute explicitly defines the factors that the trial court must consider when determining grandparent visitation. *Id.* The burden is placed on the grandparent to prove each of the statutory elements by a preponderance of the evidence, and the trial court erred in *Bowen* in not requiring the grandparents to show that the parent's decision to limit or deny visitation would likely cause harm to the grandchildren. *Id.*

In the present case, unlike in *Bowen,* the trial court failed to even address the required element of harm that M.F. would suffer from a loss of her relationship with Elliott, and we find insufficient evidence in the record to satisfy Elliott's burden of proving this statutory element. Thus, the trial court's finding that Elliott had proved that visitation was in M.F.'s best interest is clearly erroneous, and we reverse the trial court's order granting Elliott's petition. Given our reversal on Favano's first point on appeal, we find it unnecessary to address the merits of her argument regarding the denial of her motion for new trial.

Reversed and dismissed.

VAUGHT, C.J., and PITTMAN, HART, and ROBBINS, JJ., agree.

GRUBER, GLOVER, ABRAMSON, and BROWN, JJ., dissent.

RAYMOND R. ABRAMSON, Judge, dissenting.

The sole issue in this appeal is whether the trial court clearly erred when it found that the loss of the relationship between M.F. and her grandmother is likely to harm the child. In resolving this question, it is crucial that we keep in mind our standard of review. Our supreme court has held repeatedly that it would not reverse a finding by a circuit court in an equity case unless it was clearly erroneous. *In re Adoption of J.P.,* 2011 Ark. 535, 385 S.W.3d 266. A finding of fact by a circuit court sitting in an equity case is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *See id.* In resolving the clearly erroneous question, we must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Id.* We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Id.* This deference to the circuit court is even greater in cases involving child custody or visitation, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*

Under these standards, this case should be affirmed. The majority places great weight on the circuit court's statement from the bench that Favano's testimony that it would be in M.F.'s best interest to have a relationship with Elliott met the best interest "hurdle." I note first that this is not an explicit finding regarding likely harm. In the absence of a showing to the contrary, we presume that a court acted properly and made the findings necessary to support its judgment. *McCrack-*

*en v. McCracken,* 2009 Ark. App. 758, at 7, 358 S.W.3d 474, 479 (citing *Coon v. State,* 76 Ark. App. 250, 65 S.W.3d 889 (2001)). The majority appears to conclude that Favano "owned" the thought when she made the "best interest" statement, and thereby precluded the trial court from reaching the same determination. Furthermore, focusing on this single statement by the trial court, to the exclusion of other relevant evidence, has tainted the majority's analysis; the focus instead should be whether sufficient evidence was put forth to sustain the finding of likely harm.

The record is replete with evidence that Elliott had a positive, loving relationship with M.F. and that without court-ordered grandparent visitation the child's relationship with her extended family on her biological father's side would be lost. Elliott was the supervisor of her son's visitation with M.F. during the divorce proceedings, exercised his visitation when he was serving our country in Iraq, and, as the majority concedes, had the requisite "significant and viable relationship with the child." Favano testified that it was in her daughter's best interest to have a relationship with her deceased father's family, and there was ample evidence that cutting off this relationship would be harmful. For example, Elliott testified that M.F. would have an emotional void without this relationship, and Janice Hill, M.F.'s aunt, testified that Favano's decision to prohibit visitation was emotionally harmful to M.F. The trial court absorbed all of this testimony in reaching its decision on the merits.

The loss of a relationship with an entire side of a family, and the accompanying loss of the memory of a deceased parent, distinguishes this case from *Bowen v. Bowen,* 2012 Ark. App. 403, 421 S.W.3d 339. I dissent in this case for much the same reason that I dissented in *Bowen*—I believe there was in fact sufficient evidence to support the trial court's finding of likely harm to the child from the loss of the relationship between the petitioning grandparent and the child. While evidence in the form of expert testimony of psychological harm might be helpful, *see, e.g., Moriarty v. Bradt,* 177 N.J. 84, 827 A.2d 203 (2003) (trial court noted that "all the experts agreed" that the children should continue to have a relationship with their grandparents), I believe that proof that a child will lose a nurturing, loving relationship with an entire branch of her family is sufficient to support a finding of likely harm.

The trial court is in a far better position than this court to determine the best interest of the child—which includes likelihood of harm—in these fact-intensive, credibility-driven cases involving grandparent visitation. Indeed, the trial court underscored its familiarity with these parties and their family matters when it noted at the conclusion of the hearing, "I handled the divorce between Mr. Hill and Mrs. Favano, and I handled the post-divorce issues, and they had plenty of them." This familiarity and ability to judge the credibility of the witnesses is the very reason that our deference to the trial court is even greater in cases involving child custody and visitation. Here, where there was certainly evidence from which the trial court could find that M.F. would likely be harmed by the loss of the relationship with her grandmother (and, as a result, her deceased father's entire family), this court should affirm.

I respectfully dissent.

GRUBER, GLOVER, and BROWN, JJ., join in this dissent.