2011 Ark. 535

**In re ADOPTION OF J.P.**

**Derek Lee Pippinger, Appellant**

v.

**Doris Benson & Bertie May Blasingame, Appellees.**

**No. 11–675.**

Supreme Court of Arkansas.

Dec. 15, 2011.

Rehearing Denied Jan. 19, 2012.

Chesley David Dunlap, Trumann, for appellant.

Melissa Bristow Richardson, Jonesboro, for appellees.

PAUL E. DANIELSON, Justice.

Andrea Pippinger appeals from the circuit court's order denying her petition to adopt J.P., her stepson, and appellant Derek Pippinger appeals from the circuit court's order granting visitation with his son, J.P., to appellees Doris Benson and Bertie May Blasingame, J.P.'s maternal grandmother and great-grandmother. The Pippingers originally appealed the circuit court's order to the court of appeals, and that court affirmed. *See Pippinger v. Benson,* 2011 Ark. App. 442, 384 S.W.3d 614. They petitioned this court for review, which we granted. Upon granting a petition for review, this court considers the appeal as if it had been originally filed in this court. *See Duncan v. Duncan,* 2011 Ark. 348, 383 S.W.3d 833. There are three points on appeal: (1) that the circuit court erred in allowing Doris and Bertie to intervene in the adoption proceeding; (2) that the circuit court erred in granting Doris and Bertie grandparent and great-grandparent visitation; and (3) that the circuit court erred in denying the petition for adoption. We reverse and remand the circuit court's award of grandparent and

great-grandparent visitation, and we affirm the circuit court's denial of the petition for adoption.

The basic underlying facts are these. On July 21, 2009, Andrea filed a petition to adopt her stepson, J.P. The petition stated that J.P. was born December 28, 2006, and that his biological mother, Angela, died January 20, 2008. The same day the petition for adoption was filed, Derek, J.P.'s father, filed a consent to the adoption and waiver of appearance. In accordance with Arkansas Code Annotated § 9-9-212(f) (Supp.2007), a notice of the pending petition and its hearing date was issued to Doris and Gerald Benson, J.P.'s maternal grandmother and grandfather.

On September 24, 2009, the petition was called for a hearing. At the hearing, the circuit court observed that, while an affidavit of service reflected service on Doris and Gerald, no pleading had been filed by them challenging the adoption, or requesting relief; however, Bertie, J.P.'s great-grandmother, was present at the hearing. The circuit court agreed to then reset the matter for a special setting, rather than hearing the matter in the one hour previously allotted. It further advised Bertie that if "they" desired any action be taken on their behalf, they needed to be represented by an attorney and to file the proper pleadings.

On October 5, 2009, Doris and Bertie filed a petition for temporary and permanent grandparent and great-grandparent visitation in the domestic-relations division of the circuit court.[1] In their petition for visitation, Doris and Bertie noted the step-parent-adoption matter that was pending and asked that the actions be consolidated or heard simultaneously. On October 6, 2009, Doris and Bertie filed an answer to the petition for adoption, motion to inter-vene, and third-party petition for grandparent and great-grandparent visitation. In response, Andrea filed a motion to strike Doris and Bertie's responsive pleading in the adoption proceeding on the basis that they lacked standing. After the circuit court consolidated both matters for the purpose of hearing evidence, a hearing was held at which the circuit court heard testimony and the arguments of counsel. The visitation petition was taken up first.

During the hearing, Bertie testified that after J.P. was born and Angela was discharged from the hospital, they went to her house and stayed there approximately six weeks while Angela recuperated from a Caesarean section. Bertie stated that after J.P. had surgery at Arkansas Children's Hospital, J.P. returned to his parents' home with them, where she stayed the night and she, Doris, and Gerald took turns helping with J.P. About three weeks after his surgery, J.P. was taken to Bertie's home, where he spent many nights, along with Angela and Derek. Bertie testified that Angela and Derek would often take J.P. for a few days at a time from her home and that the most he was away from her at one time was three to four days. During this time, Bertie testified, she and Doris were taking care of J.P., with Derek stopping by at night to check on him, unless it was too late; Angela was there every day and would spend the night. It was Bertie's testimony that during the first year of J.P.'s life, she had contact with him about ninety percent of the time.

Bertie stated that after Angela died on January 20, 2008, Derek took J.P. to stay at his mother's home. Bertie testified that after Angela's funeral, Derek would bring J.P. to Bertie and allow him to spend the weekend with her and Doris; they did so at Angela and Derek's mobile home into

---

1. Gerald did not join in any of the pleadings filed by Doris and Bertie.

which she had temporarily moved at Derek's request. This arrangement was in place until August 2008, when, according to Bertie, Derek said he "needed some weekends." After that, she stated, they usually were allowed to keep J.P. every other weekend. It was at this time that Bertie moved out of the mobile home and back to her home. Bertie testified that their every-other-weekend visits with J.P. ceased on October 31, 2008. She testified that Derek later allowed J.P. to attend church with her, and that in February 2010, he allowed J.P. to stay approximately three hours with her, Doris, and Gerald at her home, as her counsel described, "unsupervised."

Bertie testified that they have been allowed to visit with J.P., typically, at Derek and Andrea's home "about every week on Tuesday nights usually for a while." She stated that, while she had asked to take J.P. to her home or out to eat, Derek refused. She admitted, however, that they had been invited to birthday parties and other events involving J.P.

With respect to the adoption petition, Bertie testified that she did not think the adoption was in her great-grandson's best interest and that it was "too soon." She testified that she believed it was in J.P.'s best interest to have "unsupervised" visitation with her and that she would abide by Derek's "rules." She also stated her belief that if she was not awarded great-grandparent visitation, she did not think that she would have any future contact with J.P. However, Bertie admitted that neither Derek nor Andrea had told her that she could not see J.P. in the future, nor had they kept her from seeing J.P.; she stated that her visits had only been limited to every week at Derek and Andrea's home.

Doris, J.P.'s maternal grandmother, testified that the longest period of time that J.P. did not spend the night at Bertie's home between his birth and Angela's death was three nights. Doris testified that after a falling out with Derek and Andrea on November 3, 2008, she was finally allowed to see J.P. on Christmas night at Derek and Andrea's home, but that she no longer had any "unsupervised" visits with him. She, like Bertie, testified that she feared that if she were not granted visitation with J.P., she would not get to see him. She also testified that she would abide by any restrictions placed on the visitation by the circuit court. Also like Bertie, Doris stated that she did not think that the adoption was in J.P.'s best interest. She testified that while she still had contact with J.P., it was very little and that one hour each week was not enough. She stated that she wanted more visitation and that she wanted that visitation to be "unsupervised"; however, she admitted, she and Bertie were allowed a three-hour visit with J.P. on February 12, 2010, and they were also allowed by Derek to take J.P. to church.

Gerald, J.P.'s maternal grandfather, testified that he did not join in the petition for visitation because he believed Derek "would come around and do what's right." Gerald stated that he hoped that he would be able to see J.P. more in the future.

Derek testified that he and Angela married in January 1999 and that J.P. was born on December 28, 2006. He testified that he, Angela, and J.P. stayed at Bertie's home for about a week after J.P. was born and that they also stayed there after J.P. had surgery at Arkansas Children's Hospital. Derek disputed Bertie's claim that J.P. was with her ninety percent of the time his first year. He agreed that J.P. was at Bertie's home almost every weekend and explained that this was because Angela wanted J.P. to spend time with Gerald, who worked out of town during the week. He further testified that J.P. also

spent a night or two sometimes at Bertie's during the week.

Derek denied that he had restricted or limited Doris's and Bertie's contact with J.P. He agreed, however, that, with some exceptions, there were no longer "unsupervised" visits and that their contact with him was less than what it had been. He testified that, after Angela's death, he hired Andrea to babysit J.P. He stated that he and Angela had discussed such an arrangement prior to her death.

Derek testified that he began dating Andrea six months after Angela's death. He stated that he then moved in with her, and that, on May 23, 2009, they were married. It was his testimony that it was merely coincidental that the decrease in J.P.'s time with Doris and Bertie coincided with the time that he started living with Andrea. He testified that after his dispute with Doris on November 3, he stopped allowing J.P. to go to Bertie's because he knew Doris would be there, and he was upset with Doris. He contended that the argument with Doris had to do with the cleanliness of his mobile home.

Derek further stated that when he allowed the visits at his home, neither he nor Andrea supervised them; he testified that he and she went into the kitchen and that they made sure Andrea's children were not there such that the whole house was available for the visit. He explained that the time of the visits, after 6:30 p.m., was chosen to accommodate Gerald's work schedule and that Derek conducted the visits at his house because he believed Bertie to be too controlling. He testified that the situation was improving and that he would permit J.P. to go to Bertie's house in the future. He stated that he and Andrea were "not cutting" them off and had "never not allowed them to see [J.P.]" He further testified that Bertie and Doris

call J.P. and that J.P. speaks with them on the phone.

Derek recounted his answer to an interrogatory that he believed supervised visits with J.P. were in J.P.'s best interest because "of the things they have said to me about myself, also taking [J.P.] to the grave of Angela and telling him to jump and stomp around on his mother[;] Doris has a nasty home and nowhere for him to play[; t]he plaintiffs are old and not in good health[;] Gerald Benson drinks[; t]hey are constantly reminding the minor child of his deceased mother[; and t]he things they are doing is [*sic*] unhealthy for his mental and emotional well being." He acknowledged that continued visitation with Doris and Bertie was in J.P.'s best interest and that he had no doubt of their love and affection for J.P.

Derek relayed that the reason he consented to the petition for adoption was because he feared that if something happened to him, there would be a custody battle over J.P. He testified that Andrea was originally J.P.'s godmother, now his mother, and that "Angela wanted it to be this way."

Finally, Andrea testified that she filed the petition to adopt J.P. a few weeks after she and Derek married. She testified that she and her first husband separated two months after Angela's death and that her divorce was final on June 23, 2008. She stated that within two weeks of her divorce, she and her children moved in with Derek. She stated that she shared joint custody of her children with her ex-husband, while she and Derek had J.P. one hundred percent of the time.

After the circuit court heard the foregoing testimony, it turned to the merits of the adoption petition and heard testimony in support thereof. Andrea testified that she first had contact with J.P. when he was born; she was present at Angela's

first ultrasound and she was present for his birth. She testified that during the November 2008 confrontation at the mobile home Derek and Angela had shared, there were some exchanges between her and Doris. She stated that when she went to leave, Doris grabbed her arm and tried to grab J.P.; she then told Doris not to touch her. Andrea testified that the argument escalated and that when Doris asked what she had ever done to Andrea, Andrea accused Doris of killing her friend, Angela, because Andrea believed that Doris and Bertie were trying to control Angela. She further testified that Doris later accused her of having an affair with Derek while Angela was still living, which Andrea denied.

Andrea testified that she was in good health and that she had never been arrested or charged with a crime. She admitted that her brother had been to prison in another state, but she was unable to remember why; however, she said, he was not around J.P. on a regular basis. With respect to her relationship with J.P., Andrea testified that he was her son, he called her "mom," and they did everything together. She said that her children from her previous marriage got along perfectly with J.P. and that he had a good relationship with each child. She testified that at the appropriate time they intended to tell J.P. that he was adopted by her, that she was not his biological mother, that Angela was, and that Angela had passed away. She testified that she had kept a journal of visits J.P. had with Bertie, Doris, and Gerald.[2] She further testified that she and Derek had no intention to disallow future visits by them with J.P. if the adoption was granted. In addition, Donna Pippinger, J.P.'s paternal grandmother,

testified that she had been to Derek and Andrea's home on a regular basis and that J.P. was "so happy." She opined that Andrea was a wonderful mother and that J.P. loved her. The circuit court then took both matters under advisement.

The circuit court later issued a letter opinion, in which it made multiple findings of facts and conclusions of law, and it ultimately entered its final order, incorporating its letter opinion and finding, in pertinent part, that

(1) a significant and viable relationship has and does exist between grandmother [Doris] and great-grandmother [Bertie] with grandson and great-grandson [J.P.]; (2) that visitation between grandmother [Doris] and great-grandmother [Bertie] with grandson and great-grandson [J.P.] is in the best interests of [J.P.]; (3) visitation between the grandmother [Doris] and great-grandmother [Bertie] with grandson [J.P.] is set out hereinafter; (4) the adoption of [J.P.] by Andrea Pippinger is not in the best interest of [J.P.]; and (5) the Petition to Adopt filed July 21, 2009 by Andrea Pippinger is denied.

The circuit court awarded Doris and Bertie visitation with J.P. one weekend each month; one week during summer vacation of each year; and two days during Christmas vacation of each year. In addition, the circuit court ordered that they could call and speak with J.P. not less than once per week for a time not exceeding fifteen minutes and could have contact with J.P. through other means of written communication including via the Internet and mail. It directed that Doris and Bertie were to share the same time for visitation with J.P. and that the visitation was to be cen-

---

2. The journal was admitted and reflected ongoing visits between Doris, Bertie, Gerald, and J.P. from December 25, 2008, through February 24, 2010. Subsequent entries were later admitted separately.

tered at Bertie's home. And, further, the circuit court stated that it would not sanction any prohibition of discussions concerning J.P.'s biological mother and the maternal family.

With respect to its denial of the adoption petition, the circuit court found that

[a]lthough Derek and Andrea testified that it was a coincidence, the restriction of [Doris]'s and [Bertie]'s contact with [J.P.] began when Derek and Andrea started dating. From an observation of Andrea as a witness, the Court finds Andrea's attitude toward [J.P.] to be possessive and exclusive of the maternal family. The Court finds that an adoption of [J.P.] by Andrea would not be conducive to fostering a relationship between [J.P.] and his maternal family. A hindrance or loss of a relationship with his maternal family would not be in the best interest of [J.P.]

The circuit court then concluded, after consideration of all of the best-interest factors, the adoption of J.P. by Andrea was "not currently" in J.P.'s best interest. It is from this order that Derek and Andrea now appeal.

## I. *Intervention*

For the first point on appeal, Andrea argues that the circuit court erred in allowing Doris and Bertie to intervene in the adoption proceeding. She contends that while Doris and Gerald, as grandparents, were entitled to notice of the adoption petition, they were not entitled to intervene. Moreover, she claims, Bertie was entitled to neither notice nor intervention, as the statute authorizing notice of a pending adoption petition does not include great-grandparents. Andrea further avers that while Doris and Bertie had neither the right to intervene nor the right to be heard in the adoption matter, they were erroneously permitted to testify at length

on issues directly related to the adoption proceeding. Doris and Bertie counter that Andrea's argument mischaracterizes the circuit court's consolidation of the domestic-relations matter and the probate matter for trial. They maintain that there was no error on the part of the circuit court in consolidating the two matters for hearing and ruling on them separately.

■ We agree with Doris and Bertie, because a close review of the record reveals no ruling by the circuit court on Doris and Bertie's motion to intervene. Instead, the circuit court denied Andrea's motion to strike Doris and Bertie's motion. The circuit court did so on the basis that it had consolidated the visitation and adoption matters for the purpose of hearing evidence. It is well settled that where there is no specific ruling by the circuit court for this court to review, we will not consider the argument. *See Hanks v. Sneed,* 366 Ark. 371, 235 S.W.3d 883 (2006).

■ To the extent Andrea's argument is a challenge to the denial of her motion to strike, we find no error. In reviewing the denial of a motion to strike, this court has used an abuse-of-discretion standard of review. *See Orr v. Hudson,* 2010 Ark. 484, 374 S.W.3d 686. Here, the circuit court denied the motion to strike on the basis that the two actions would be taken up together and ruled on separately. Moreover, Andrea made no challenge to the circuit court's consolidation of the matters, nor did she object to Doris's or Bertie's testimony relating to whether the adoption was in J.P.'s best interest. We cannot say that the circuit court abused its discretion in denying the motion to strike.

## II. *Grandparent & Great-grandparent Visitation*

Derek, for the second point on appeal, argues that the circuit court erred in

granting Doris and Bertie's petition for grandparent and great-grandparent visitation. He contends that where he did not cease Doris and Bertie's visits with J.P. altogether, Doris and Bertie failed to prove a loss of the relationship, which is required to rebut the statutory presumption that any limitation by the custodian is in the child's best interest. He asserts that the circuit court's finding of a loss of the relationship was error, where Doris and Bertie were still permitted to visit with J.P. Because Doris and Bertie's request was not for *any* visitation, but *more* visitation, he submits, the circuit court erred in awarding visitation.

Doris and Bertie respond that it was undisputed that Derek had limited their contact with J.P., as their visits occurred on a limited basis, only at Derek's home, and under his supervision. They maintain that the instant case can be distinguished from the precedent of this court and the court of appeals and that Derek had sharply and unreasonably restricted their contact with J.P., resulting in a loss of the relationship required to rebut the statutory presumption.

The fixing of visitation rights is a matter that lies within the sound discretion of the circuit court. *See Hudson v. Kyle,* 365 Ark. 341, 229 S.W.3d 890 (2006). The main consideration in making judicial determinations concerning visitation is the best interest of the child. *See id.* Further, this court has traditionally reviewed matters that sounded in equity de novo on the record with respect to factual questions and legal questions. *See id.* We have stated repeatedly that we would not reverse a finding by a circuit court in an equity case unless it was clearly erroneous. *See id.* We have also stated that a finding of fact by a circuit court sitting in an equity case is clearly erroneous when, despite supporting evidence in the record,

the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *See id.* In resolving the clearly erroneous question, we must give due regard to the opportunity of the court to judge the credibility of witnesses. *See id.* We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *See Bethany v. Jones,* 2011 Ark. 67, 378 S.W.3d 731. This deference to the circuit court is even greater in cases involving child custody or visitation, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *See id.*

In the matter before the circuit court, Doris and Bertie sought grandparent-visitation and great-grandparent-visitation rights under Arkansas Code Annotated § 9-13-103(b)–(e) (Repl.2009), which provides in pertinent part:

(b) A grandparent or great-grandparent may petition a circuit court of this state for reasonable visitation rights with respect to his or her grandchild or grandchildren or great-grandchild or great-grandchildren under this section if:

(1) The marital relationship between the parents of the child has been severed by death, divorce, or legal separation;

. . . .

(c)(1) There is a rebuttable presumption that a custodian's decision denying or limiting visitation to the petitioner is in the best interest of the child.

(2) To rebut the presumption, the petitioner must prove by a preponderance of the evidence the following:

(A) The petitioner has established a significant and viable relationship with the child for whom he or she is requesting visitation; and

(B) Visitation with the petitioner is in the best interest of the child.

(d) To establish a significant and viable relationship with the child, the petitioner must prove by a preponderance of the evidence the following:

(1)(A) The child resided with the petitioner for at least six (6) consecutive months with or without the current custodian present;

(B) The petitioner was the caregiver to the child on a regular basis for at least six (6) consecutive months; or

(C) The petitioner had frequent or regular contact with the child for at least twelve (12) consecutive months; or

(2) Any other facts that establish that the loss of the relationship between the petitioner and the child is likely to harm the child.

(e) To establish that visitation with the petitioner is in the best interest of the child, the petitioner must prove by a preponderance of the evidence the following:

(1) The petitioner has the capacity to give the child love, affection, and guidance;

(2) The loss of the relationship between the petitioner and the child is likely to harm the child; and

(3) The petitioner is willing to cooperate with the custodian if visitation with the child is allowed.

Both parties make much of this court's decision in *Oldham v. Morgan*, 372 Ark. 159, 271 S.W.3d 507 (2008), and we find it to be controlling. In *Oldham*, Jaley Oldham's maternal grandparents sought grandparent-visitation rights under section 9–13–103 after Jaley's mother died in a car accident and full custody of Jaley was awarded to her father. The circuit court found that, while Jaley's father was a fit parent, it was in her best interest to grant her grandparents visitation rights. *See Oldham*, 372 Ark. 159, 271 S.W.3d 507. Jaley's father appealed the circuit court's decision, arguing that as a fit parent, he had a fundamental right under the Fourteenth Amendment to be free from state intrusion on his parenting and that he had allowed the grandparents visits with Jaley. *See id.* He contended, on appeal, that the grandparents only began the proceedings because they wanted a structured schedule of visitation for the future. *See id.*

After reviewing the history of Arkansas's grandparent-visitation statute, this court observed that our statute "gives the parent's decision presumptive or special weight in deciding whether grandparent visitation is in the best interest of the child" as required by the Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and our decision in *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). *Id.* at 164, 271 S.W.3d at 510. We then held that, in accord with subsection (d)(1)(C) of the statute, the grandparents had a significant and viable relationship with Jaley, and we turned to the question of whether they had proved that grandparent visitation was in her best interest. *See id.* We noted that while the circuit court had determined that it was in Jaley's best interest to have grandparent visitation with her grandparents, the testimony at trial in no way supported a finding, required under section 9–13–103(e)(2), that the loss of the relationship between Jaley and her grandparents would likely result in harm to Jaley. *See id.*

Pointing to Jaley's grandmother's testimony that she had seen Jaley seven times,

including four overnight visits, during a two-and-one-half-month period, we observed that there was no evidence presented that the relationship between Jaley and her grandparents "had been lost or would be lost." *Id.* at 166, 271 S.W.3d at 511. Notably, we said that

> no one disputes that [Jaley's father] was allowing [her grandparents] to see Jaley before the filing of the petition for grandparent visitation. According to [her grandmother's] testimony at the hearing, the petition was only filed to ensure that the [grandparents] would continue to see Jaley in the future. Therefore, the petition for grandparent visitation in this case was premature.

*Id.*, 271 S.W.3d at 511–12. We then held that because the grandparents failed to prove a loss of the relationship between them and Jaley that would likely harm her, they failed to establish that court-ordered visitation was in her best interest and therefore failed to rebut the statutory presumption. *See id.* We reversed the circuit court's award of visitation, holding that the circuit court abused its discretion in granting the grandparents visitation.

■ In the case before us, there was a rebuttable presumption that Derek's decision limiting Doris and Bertie's visitation was in J.P.'s best interest. *See* Ark. Code Ann. § 9–13–103(c)(1). To rebut that presumption, Doris and Bertie were required to prove, by a preponderance of the evidence, both a significant and viable relationship with J.P. and that visitation with them was in J.P.'s best interest. *See* Ark.Code Ann. § 9–13–103(c)(2). To prove visitation was in J.P.'s best interest, Doris and Bertie were required to prove, by a preponderance of the evidence, that (1) they had the capacity to give J.P. love,

affection, and guidance; (2) the loss of the relationship between them and J.P. was likely to harm him; and (3) they were willing to cooperate with Derek if visitation with J.P. was allowed. *See* Ark.Code Ann. § 9–13–103(e).

■ Here, the circuit court found that Doris and Bertie had proved by a preponderance of the evidence that they had the capacity to give J.P. love, affection, and guidance, and that they were willing to cooperate with Derek if visitation with J.P. was allowed. We cannot say that those findings by the circuit court were clearly erroneous based on the testimony set forth above. However, we are left with a definite and firm conviction that a mistake has been committed with respect to the circuit court's finding that Doris and Bertie had proved by a preponderance of the evidence that the loss of the relationship between them and J.P. was likely to harm J.P.

■ In order to establish the loss of a relationship, under *Oldham*, evidence must be presented demonstrating that the relationship between the grandparents and grandchild "had been lost or would be lost." [3] *Oldham*, 372 Ark. at 166, 271 S.W.3d at 511. However, as was the case in *Oldham*, no one disputes that Derek was allowing Doris and Bertie to visit J.P. before the filing of their petition for grandparent and great-grandparent visitation; on the contrary, Bertie testified that she had not been precluded from visiting J.P. by Derek, nor had he told her that she could not see J.P. in the future. Likewise, Doris testified that she simply wanted "more" visitation than one hour per week and that she wanted the visits to be "unsupervised." In addition, Derek testified that he had never "cut off" their visitation

---

**3.** To the extent that the court of appeals' decision in *Grant v. Richardson*, 2009 Ark. App. 187, 300 S.W.3d 499, which was cited by Doris and Bertie, conflicts with our decision, it is overruled.

and that he intended on allowing them "unsupervised" visits with J.P. in the future. Finally, the circuit court found that Derek had "severely restricted contact" between Doris and Bertie and J.P. and that the limitations placed by Derek on their visitation were unreasonable. But even these findings reveal that there was indeed a relationship in existence that, while limited, had not been lost; nor was any evidence presented that the relationship would be lost.

For the foregoing reasons, Doris and Bertie's petition for grandparent and great-grandparent visitation, like that in *Oldham*, was premature. *See also Hollingsworth v. Hollingsworth*, 2010 Ark. App. 101, 377 S.W.3d 313 (holding that where the relationship between a grandfather and grandson had not been lost, because visitation had only been curbed and not denied, the circuit court did not abuse its discretion in denying the grandfather's petition for grandparent visitation). Simply put, visitation was not denied to Doris and Bertie, and their relationship with J.P. had not been lost. Because Doris and Bertie did not prove by a preponderance of the evidence the loss of a relationship between them and J.P. that would likely harm J.P., they failed to establish that visitation with them was in J.P.'s best interest. In light of such failure, the circuit court clearly erred in finding that Doris and Bertie rebutted the statutory presumption, and it abused its discretion in

granting them grandparent and great-grandparent visitation under section 9–13–103.[4] We therefore reverse and remand the circuit court's order for grandparent and great-grandparent visitation.

### III. *Adoption*

For the final point on appeal, Andrea argues that, considering the evidence before the circuit court, the circuit court erred in denying her petition for adoption.[5]

Before an adoption petition can be granted, the circuit court must find from clear and convincing evidence that the adoption is in the best interest of the child. *In re Adoption of M.K.C.*, 2009 Ark. 114, 313 S.W.3d 513. We will not reverse a circuit court's decision regarding the best interest of a child to be adopted unless it is clearly against the preponderance of the evidence, giving due regard to the opportunity and superior position of the circuit court to judge the credibility of the witness. *See id.* Personal observations of the court are entitled to even more weight in cases involving the welfare of a young child. *See In re Adoption of Perkins/Pollnow*, 300 Ark. 390, 779 S.W.2d 531 (1989).

Here, the circuit court found, in pertinent part:

Although Derek and Andrea testified that it was coincidence, the restriction of [Doris]'s and [Bertie]'s contact with [J.P.] began when Derek and Andrea

---

4. We note that Ark.Code Ann. § 9–9–215(a)(1) (Repl.2009), which concerns the effect of a decree of adoption and provides, in pertinent part, that

in cases where a biological or adoptive parent dies before a petition for adoption has been filed by a step-parent of the minor to be adopted the court may grant visitation rights to the parents of the deceased biological or adoptive parent of the child if such parents of the deceased biological or adoptive parent had a close relationship with the

child prior to the filing of a petition for step-parent adoption, and if such visitation rights are in the best interests of the child[,] is not at issue in this case.

5. While Doris and Bertie addressed this issue in the responsive brief to this court, we do not include their arguments as there was no ruling on their motion to intervene in the adoption proceeding, and, therefore, they were not parties to the adoption matter. *See infra.*

started dating. From an observation of Andrea as a witness, the Court finds Andrea's attitude toward [J.P.] to be possessive and exclusive of the maternal family. The Court finds that an adoption of [J.P.] by Andrea would not be conducive to fostering a relationship between [J.P.] and his maternal family. A hindrance or loss of a relationship with his maternal family would not be in the best interest of [J.P.]

Considering all the best interest factors, the Court finds that the adoption of [J.P.] by Andrea is not currently in the best interest of [J.P.] The Petition for Adoption is denied.

It is clear from Andrea's testimony that tension existed between her and J.P.'s maternal family. It is that tension that troubled the circuit court and served as the court's basis for finding that the adoption was not currently in J.P.'s best interest; we do not disagree. That is not to say that it would not be in his best interest at some point in the future. However, giving due regard to the opportunity and superior position of the circuit court to judge the witnesses before it, we cannot say the circuit court's finding that adoption was not currently in J.P.'s best interest was clearly against the preponderance of the evidence. For this reason, we affirm the circuit court's denial of the petition for adoption.

Affirmed in part; reversed and remanded in part. Court of Appeals' opinion vacated.