
# ARKANSAS COURT OF APPEALS

### DIVISION IV
**No.** CV-14-979

| | |
|---|---|
| MALIA DRINKWITZ<br><br>          APPELLANT<br><br>V.<br><br><br>JERRY DRINKWITZ AND SUSAN DRINKWITZ<br><br>          APPELLEES | **Opinion Delivered** May 27, 2015<br><br>APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT<br>[NO. 17DR-10-373 (II)]<br><br>HONORABLE MICHAEL MEDLOCK, JUDGE<br><br>REVERSED |

## BART F. VIRDEN, Judge

Appellant Malia Drinkwitz appeals from the Crawford County Circuit Court's order granting visitation with Malia's children, M.D.1 and M.D.2, to the paternal grandparents, appellees Jerry and Susan Drinkwitz. On appeal, Malia argues that the trial court erred in granting visitation because the Drinkwitzes failed to prove that visitation was in the children's best interest given that (1) they had not lost their relationship with the children, (2) they could show no harm that came from limiting their contact, and (3) they had demonstrated an unwillingness to cooperate with her concerning visitation. We agree in part with Malia's first point and therefore reverse and vacate the visitation order.

I. *Factual Background*

Malia and the children's father, Zachary Drinkwitz, divorced in December 2010, and Malia was awarded custody of the children. There was evidence that Zachary's drug abuse was a factor in the divorce. Zachary neither regularly exercised his visitation rights nor paid



any child support; however, his parents, the Drinkwitzes, had frequent contact with the children.

In August 2013, the Drinkwitzes filed a motion for grandparent-visitation rights. They alleged that, although they had always maintained a close relationship with the children, Malia had begun keeping the children away from them. Malia denied this assertion. In April 2014, the trial court entered a temporary order establishing a visitation schedule. In the final order, the trial court granted visitation rights to the Drinkwitzes. From that order comes this appeal.

## II.   *Hearing in June 2014*

Susan testified that after Malia's divorce from her son, the children continued to attend family holiday events and birthday parties. Also, the Drinkwitzes continued to babysit as needed and to pick up the children from school. According to Susan, between August 2012 and July 2013, they probably saw the children at least once a month.

The evidence showed that some time after August 2012, the children were at the Drinkwitzes' home visiting, and Zachary was present. Despite Malia's specific request that Zachary not be left alone with the children, the Drinkwitzes permitted him to take the children on what they thought was a quick trip to Dollar General. Instead, Zachary took the children to the home of his girlfriend, who was said to have "major drug issues," and introduced them to their new half brother, whom they did not know about. Malia was upset when she discovered where they had gone. Susan, while denying any prior knowledge of Zachary's intentions, conceded that she used very poor judgment in permitting her son to

take the children. Susan testified, however, that, even after that incident, Malia permitted them to see the children.

Susan testified that they did not see the children over Christmas 2012 and that it was not until mid-January 2013 that the children got their Christmas presents. January 2013 was the first time Malia had not allowed the children to travel with them to attend another grandchild's birthday party in Northwest Arkansas. The Drinkwitzes saw the children in March for their annual daffodil trip, but they did not see the children again until the end of July or early August when they met at a mall. According to Susan, Malia told her at that time that "she was starting a new life"; that they would be moving soon; and that it was time to "cut off all emotional ties with the family." Susan claimed that she asked for visitation between March and July but that her phone calls and text messages went unanswered by Malia, which she said was unusual. Susan testified that Malia had explained in a text message that they were busy, and Susan conceded that Malia was working with them on visitation "in her way." After the Drinkwitzes filed their petition in August, Malia did not bring the children by to visit in September, October, and November 2013, but the Drinkwitzes saw the children around Christmas 2013.

During those months before Christmas, Susan appeared at M.D.1's school without Malia's permission with balloons and a card instructing the child to ask Malia to come by the Drinkwitzes' house. On another occasion, Susan passed a note to M.D.1's friend to give her saying that her father was fine after having been beaten with a baseball bat and encouraging her to hide the note in her desk at school. Susan conceded that her actions were

inappropriate and may have contributed to a breakdown of trust with Malia. Susan testified that she had no complaints about Malia as a mother and her ability to make decisions that were in the best interest of her children.

Jerry testified that he and Susan filed for grandparent-visitation rights because they wanted "some sort of known amount of time" with the children. He stated that, even though they had been seeing the children all along, he felt like they had lost a relationship with the children in 2013 because Malia was "road-blocking" them. According to Jerry, after Susan went to M.D.1's school, Malia threatened to get a restraining order.

Malia testified that she was engaged to be married and wished to move out of state.[1] Malia agreed that prior to 2012 the Drinkwitzes had more access to the children but insisted that she did not cut off contact with them. She said that she had asked the Drinkwitzes to speak with her first about activities, instead of getting the children's hopes up, but that they had simply gone around her. Malia testified that, when they met at a mall in July 2013, she asked Susan not to remind her children that they had missed another grandchild's birthday party or tell how their cousin had cried when he did not get to see them because news of that sort upset the children.

Malia read a text message she had sent to Susan: "While I will continue to have [M.D.1 and M.D.2] have time with you, I do not feel that strong family ties with the rest of the family should be encouraged." Malia explained that, while she had no problem with the

---

[1]An agreed order was entered in August 2014 permitting Malia to relocate to Oklahoma, where her fiancé lived.

children seeing their cousins, other family members had called her a bitch, said she was "crazy and bi-polar," threatened her, and suggested that she was taking drugs. Malia expressed her concern that those family members would speak negatively about her and try to turn her children against her.

Malia testified that she wanted the children to know their grandparents. She said that she had never not permitted the Drinkwitzes to see the children but that she wanted to be able to put parameters on the visitation. Malia said that she would permit the Drinkwitzes to see the children even if the court denied their request for visitation rights. She testified that after the case was heard in February 2014, the visitation resumed at that time. Malia testified that the Drinkwitzes did not ask for visitation after they filed their petition and that she was uncertain whether she could contact them while the litigation was pending.

The attorney ad litem, Cheryl Anderson, submitted a report following the hearing. She wrote that M.D.1 and M.D.2 were "incredibly bright, entertaining and engaging" and were "doing exceptionally well," despite their father's drug addiction. She noted that the children were at ease when interacting with the Drinkwitzes but had expressed their desire that Malia be able to decide when they see their grandparents. She wrote, "I don't know that the relationship had been lost at the time of the filing of the petition, although I recognize and appreciate that [the Drinkwitzes] perceived it to be lost. The grandparents clearly were no longer enjoying the frequency and quality of the contact they had once had." Anderson opined that Malia was a fit mother and that the Drinkwitzes were good grandparents. Anderson wrote:

Malia did continue to allow the children to have a relationship with their grandparents until she reached a breaking point that can be attributed to a breach of trust. I believe that Malia had fostered the continued relationship between her children and the Drinkwitz grandparents even after the nasty divorce had concluded, through post-divorce cycles of visitation with a Dad who would cyclically be sober and then impaired. To me, she demonstrated a willingness to go the extra mile to keep the children connected with Dad's family longer and more significantly than many other parents might have done in the same or similar circumstances. . . . It is difficult to know if Malia would have come back around as she had done in prior instances when she was disappointed by the grandparents' actions.

The trial court entered an order in August 2014 granting the Drinkwitzes visitation rights until Zachary chose to exercise his rights as their father. In determining that visitation with the Drinkwitzes was in the children's best interest, the trial court found that (1) the Drinkwitzes had a close relationship with and loved their grandchildren; (2) the children would likely be harmed by a loss of the relationship based on "family heritage, reputation in the community, education and family experience"; and (3) the Drinkwitzes said that they were willing to cooperate with Malia "and observe her 'rules' in regard to the children."

### III. *Argument*

Malia argues that the Drinkwitzes' petition for visitation rights was premature and should have been denied because they failed to show that the relationship between them and their grandchildren had been lost. We agree in part with Malia's first point and therefore decline to reach the merits of her other points.

### IV. *Standard of Review*

The fixing of visitation rights is a matter that ultimately lies within the sound discretion of the circuit court. *In re Adoption of J.P.*, 2011 Ark. 535, 385 S.W.3d 266. Abuse of discretion is discretion applied thoughtlessly, without due consideration, or improvidently.

SLIP OPINION

*Hollingsworth v. Hollingsworth*, 2010 Ark. App. 101, 377 S.W.3d 313. Our appellate courts have traditionally reviewed matters that sounded in equity de novo on the record. *Morris v. Dickerson*, 2012 Ark. App. 129, 388 S.W.3d 910. We will not reverse a finding of fact by a circuit court unless it is clearly erroneous. *Favano v. Elliott*, 2012 Ark. App. 484, 422 S.W.3d 162. A finding of fact is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been made. *Id*. We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses, and this deference is even greater in cases involving child custody or visitation. *Id*. The main consideration in making judicial determinations concerning visitation is the best interest of the child. *In re Adoption of J.P.*, *supra*.

## V.  *Discussion*

Arkansas Code Annotated section 9–13–103(b)(1) (Supp. 2013) provides that a grandparent may petition a circuit court for reasonable visitation rights with a grandchild if the marital relationship between the parents of the child has been severed by divorce. There is a rebuttable presumption that a custodian's decision denying or limiting visitation to the petitioner is in the best interest of the child. Ark. Code Ann. § 9–13–103(c)(1). To rebut the presumption, the petitioner must prove by a preponderance of the evidence that (1) the petitioner has established a significant and viable relationship with the child and (2) visitation with the petitioner is in the best interest of the child. Ark. Code Ann. § 9–13–103(c)(2)(A) & (B). There is no dispute that the Drinkwitzes had a significant and viable relationship with



Malia's children.

Section 9-13-103(e) provides that to establish that visitation with the petitioner is in the best interest of the child, the petitioner must prove by a preponderance of the evidence the following: (1) the petitioner has the capacity to give the child love, affection, and guidance; (2) the loss of the relationship between the petitioner and the child is likely to harm the child; and (3) the petitioner is willing to cooperate with the custodian if visitation with the child is allowed.

Our supreme court has observed that our grandparent-visitation statute "gives the parent's decision presumptive or special weight in deciding whether grandparent visitation is in the best interest of the child," as required by the Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57 (2000). *In re Adoption of J.P.*, 2011 Ark. 535, at 15, 385 S.W.3d at 275. Here, Susan conceded that Malia is a fit mother, and the attorney ad litem described Malia as "a fit mother and a good mother." We hold that, under the facts of this case, the trial court clearly erred in finding that the Drinkwitzes rebutted the presumption that Malia's decision to limit visitation was in her children's best interest.

To the extent that Malia suggests that the Drinkwitzes were required to show that their relationship with the children was lost, our case law indicates that a petitioner must show that the relationship was lost or *would be* lost. *Oldham v. Morgan*, 372 Ark. 159, 271 S.W.3d 507 (2008). "[I]f there is a relationship in existence that, while limited, has not been lost, and if there is no evidence that the relationship would be lost were grandparent visitation not established by the court, a grandparent's petition for visitation is premature."

*Harvill v. Bridges*, 2012 Ark. App. 683, at 3. The trial court did not make a specific finding that the relationship was lost or would be lost if visitation rights were not granted, and the evidence would not support such a finding.

The Drinkwitzes alleged in their petition for visitation that Malia was "starting to keep" the children away from them, which is some acknowledgment that the relationship was not lost. Moreover, the evidence does not show that the relationship would be lost absent a court order. In *Oldham*, *supra*, our supreme court reversed the trial court's visitation order because there was no evidence that the relationship had been lost or would be lost; rather, the grandmother only wanted to safeguard her future right to visitation with the child. Similarly, Jerry testified that their petition was filed in order to establish "some sort of known amount of time" with Malia's children. Further, Susan testified that she did not believe that they would see the children again without a visitation order in place, but this fear of what the future held was unfounded considering that Malia had in the past demonstrated a willingness to facilitate a relationship between her children and their grandparents. We hold that the trial court abused its discretion in awarding visitation rights to the Drinkwitzes because they failed to sustain their burden of proving that visitation was in the children's best interest in that they could not show that the relationship with their grandchildren was lost or would be lost. Therefore, we reverse and vacate the visitation order.

Reversed.

GRUBER and WHITEAKER, JJ., agree.

*Gean, Gean & Gean*, by: *Roy Gean III*, for appellant.

*Lisa-Marie Norris*, for appellees.