

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV–15–624

| | | |
|---|---|---|
| | | **OPINION DELIVERED** JANUARY 20, 2016 |
| JERRY JOHNSON | APPELLANT | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT [NO. DR-2014-535] |
| V. | | HONORABLE PAMELA HONEYCUTT, JUDGE |
| SHELLEE BENNETT | APPELLEE | AFFIRMED |

**ROBERT J. GLADWIN, Chief Judge**

Jerry Johnson appeals the Craighead County Circuit Court's April 28, 2015 order denying his petition for grandparent visitation. On appeal he argues that (1) the trial court abused its discretion by refusing to deem admitted his request for admissions and (2) the trial court clearly erred in finding that it was not in the child's best interest to have visitation with him. Appellee Shellee Bennett did not file a responsive brief. We affirm.

## I. *Facts*

Appellant is the paternal grandfather of C.J., born January 5, 2010. He filed a petition to establish grandparent visitation on July 16, 2014, alleging that paternity of C.J. had been established in Tennessee and that his son, Jarrod Johnson, was ordered to pay child support to appellee Shellee Bennett, C.J.'s mother. Appellant alleged that he had frequent and regular contact with the child for at least twelve consecutive months until May 21, 2014,

when appellee refused to allow visitation. He sought visitation rights and the child's social security number in order to establish a bank account for C.J.'s benefit. Appellee filed a pro se answer on August 15, 2014, alleging that all contact with appellant ceased when she discovered evidence suggesting that he had molested C.J. during her last visit with him.

Appellant filed a request for admissions on November 24, 2014, seeking appellee's admissions that appellant had (1) frequent contact with C.J.; (2) regular contact with C.J.; (3) the capacity to give C.J. love, affection, and guidance; (4) established a significant relationship with C.J.; and (5) established a viable relationship with C.J. He also sought admissions that (6) visitation with him was in C.J.'s best interest; (7) the loss of the relationship between appellant and C.J. would harm C.J.; and (8) appellant was willing to cooperate with appellee if visitation were awarded. The certificate of service attached to the request for admissions provided that the pleading was mailed on November 13, 2014, to "Ms. Shellee Bennett, 1412 CR 739, Brookland, AR 72417."

At the February 26, 2015 hearing on appellant's petition for grandparent visitation, appellee made her appearance telephonically because of icy-road conditions. She testified that she had remarried and that her last name is Cooper. She said that she resides at 115 Perry Avenue, Grenada, Mississippi, and that she had moved there on December 16, 2014. She said that she had lived in Brookland, Arkansas, from December 31, 2013, until December 16, 2014. She explained that on November 13, 2014, she was no longer living at 1412 County Road 739, Brookland, Arkansas, because she had moved "a couple of blocks down into a bigger house," and her mail had been forwarded to her. Appellee stated that

she did not remember receiving any request for admissions, but that she did receive the protective order dated November 24, 2014.

Prior to living in Brookland, appellee lived in the area of Pleasant Shade, Tennessee. She said that she has three children—one in college, one who is eleven years old, and C.J., who is five years old. She testified that Jarrod Johnson is C.J.'s biological father, that paternity and child support had been established for C.J. in Tennessee, but that Jarrod did not have custody or visitation with C.J.

Appellee testified that appellant was living in Minnesota when C.J. was born, and he had visited C.J. after her birth. Appellant later moved to Tennessee in 2012, and he visited C.J. from thirty minutes to an hour every couple of months. After Jarrod "got more out of the picture," appellant spent more time with C.J. Appellee testified that C.J. was nearly four years old in December 2013 when she and her family moved to Brookland, Arkansas, several hours away from appellant. Appellee admitted that she had refused to allow appellant visitation with C.J. since May 2014.

Sherry Timmons testified that she was formerly married to Jarrod, and they have two girls, now ages sixteen and nineteen. She said that she also has two boys, ages ten and eight, who are not Jarrod's children. She said that appellant had been involved with her daughters since his move to Tennessee in 2012, that he had attended their basketball games, had planned special birthdays, and had also attended family functions, homecoming, and graduations. She said that he had seen them several times a month, and sometimes every week, and that many times he had included her boys in the visits. She testified that, even

though her relationship with Jarrod was not consistently good, she had an extraordinary relationship with appellant because of the time, energy, and effort that appellant had spent with her girls. She said that her girls had enjoyed a lot of time with C.J. before her move to Arkansas, and that she had no concerns about her children being in appellant's care.

Ms. Timmons testified that appellant's oldest daughter sent her an email stating that appellant "was doing all of this stuff and [I] need[ed] to get all four of [my] children out of there." She said that she questioned each of her children independently and that she had gone to the Department of Human Services, where someone in child services interviewed her children regarding the allegation in the email. She said that there was no basis for the allegation and that the woman from child services who interviewed the children admired the relationship they had built with appellant.

Appellant testified that he moved from Minnesota to Ashland, Tennessee, in 2012, and then moved to Spring Hill, Tennessee, in December 2013. He said that he has three children, Laura, Jarrod, and Melody. He claimed that his son Jarrod was an alcoholic who had failed miserably in his relationship with his children. He admitted that he had a difficult relationship with Laura but claimed that he had a wonderful relationship with Melody. He said that Laura suffered from alcoholism and that she used prescription drugs. He said he believed that his children suffered a genetic predisposition to alcoholism from their mother's family. He also believed that Laura suffered from false-memory syndrome due to her addictions. He said that Laura accused him of molesting his grandchildren, but that child services rejected the accusation, deciding that it was without foundation. He said that he

paid almost $1000 for a polygraph test to show people that "took all of her allegations together."

He testified that he began visiting C.J. once or twice a month in 2013. He said that he had a visit with C.J. in February 2014, when they stayed overnight in a hotel. He was married on December 7, 2013, to Sandy Johnson, who testified that C.J. refused to sleep alone and was comfortable with appellant.

Appellant said that the last time he saw C.J. was May 18–21, 2014, when he and Sandy took C.J. to Tennessee. He said that, on the last day, they were packed and ready to go meet appellee in Jackson, Tennessee. He was giving C.J. her last bathroom break when she screeched, said that it hurt, and explained that it was because she had not wiped good. He said he got some Vaseline and "put it on the outside of where she goes number one." He claimed that he did so because she was pointing to where her difficulty was, and she was red and apparently chapped. He then got her dressed and into the car. The car-seat strap was uncomfortable for her, and C.J. complained during the drive to Jackson.

Appellant said that they texted appellee about C.J.'s condition and told her that the child needed to be seen by a doctor. He testified that appellee never returned his calls after the child was delivered to her, and he had not seen C.J. since that time. He said that after he contacted his attorney to start the process of visitation, he became aware that appellee had made allegations that he had sexually abused C.J. He said that child services investigated and ruled the allegations unfounded. He claimed that he would be willing to cooperate with appellee if he were awarded visitation.

When questioned by the trial court, appellant said that he had slept with C.J. the night before the incident in question because C.J. wanted to sleep with him and his wife, but Sandy did not want "a squirmy kid in the bed." He said that C.J. had wet the bed the night before and he had been soaked by it. He also said that he had applied the Vaseline to the surface of C.J.'s skin. He stated that C.J. had not done any screaming or complaining about redness or soreness during the prior four days of the visit. Finally, he said that he could understand why the mother was concerned.

Appellee testified that before May 2014, she had no problem with appellant having contact with C.J. When C.J. came home from the visit in such pain, she took her straight home and put her in the bathtub. C.J. would not stop screaming, and appellee said that she saw that the child was not red on the outside but that she was red on the inside. She also saw what looked like a tear. C.J. told appellee that "he put white stuff on her private area," and this was comparable to what appellant had told her about putting Vaseline on C.J.'s vagina. Appellee took the child to the emergency room, and the child was examined. Appellee testified that there was no irritation on the outside but there was on the inside. Appellee claimed that the hospital–discharge paper "actually said sexual molestation was their diagnosis."

After C.J. had been examined at the hospital, the Tennessee Department of Children's Services investigated, and the file was admitted into evidence at the hearing. An investigatory form within the file reflects that C.J. responded to a nurse's questioning, stating that one time her grandfather had looked at her, referring to her vaginal area, and pointed

to a picture of a vagina; when asked to show the nurse where her grandfather had touched her, C.J. said, "Inside it."

Appellee testified that C.J. was not treated for a urinary-tract infection. She also claimed that the child's behavior, especially around men, became different. She said that she did not want C.J. to have any more contact with appellant and that C.J. began to display fear of men and became reserved. She testified that C.J. began wetting the bed, which was unusual. Appellee said that she had not known that C.J. was sleeping with appellant until C.J. returned from "that visit at their house." She said that C.J. had always slept alone before. She said that C.J. was two years old the last time she saw her half sisters and that C.J. did not talk about her father. Appellee said that she had remarried, that her new husband wanted to adopt C.J., and that C.J. considered him to be her father.

The trial court took the case under advisement and issued a letter opinion on March 18, 2015, denying appellant's petition for visitation and denying appellant's motions to deem admitted the request for admissions and for a default judgment. The trial court's order states in pertinent part as follows:

35. It is questionable whether petitioner has proven he has capacity to give love, affection and guidance. Each of Mr. Johnson's three children have significant issues as adults. Those issues include criminal activity, drug and alcohol addiction and allegations of sexual abuse by Mr. Johnson on one of his children.

36. Petitioner has failed to prove that the loss of the relationship between he and the child is likely to harm the child.

37. Respondent testified that the psychologist recommended [C.J.] have no further contact with petitioner. No one knows for sure if petitioner sexually abused this child or not however, the greater weight of the evidence suggests that he did. That evidence being she was returned to her mother in so much



pain she was walking bowlegged, she was screaming out in pain, her vagina was red and swollen, she told the nurse he stuck his finger inside her vagina, not on the outside as he stated, she said at the time I had white stuff on there which, does not sound like vaseline, each and every one of the symptoms testified to by respondent are classic signs of sexual abuse, *i.e.* bed wetting, afraid of men, thumb sucking, not wanting to sleep by herself. Most importantly, the medical exam did not find an alternate cause for her redness and screaming in pain. She was not treated for a urinary tract infection as petitioner suggested was the cause.

38. Petitioner wants to have unsupervised visits and wants to take the child to his home. The parties no longer live in the same state and live four and one-half to six and one-half hours away from each other making it very difficult if not impossible for the mother to supervise any visits or to be near in case of an emergency.

39. The preponderance of the evidence is that petitioner inappropriately put his finger(s) in this child's vagina. The Court questions his decision to treat a "urinary tract" infection by rubbing vaseline on her, especially in her vagina. The Court also found it suspicious that petitioner said he never touched her genitals while bathing her, he allowed her to do that but, he certainly didn't hesitate to rub her genitals with vaseline, when his wife was outside in the yard. Also suspicious was his voluntary statement at the time of pickup/drop off that, I didn't touch her down there.

40. The preponderance of the evidence is that it would not be in the child's best interest to award visitation at this time.

41. This Court finds that the presumption toward the mother's decision has not been rebutted and the petition is denied.

After the order was entered, appellant filed a timely notice of appeal, and this appeal followed.

## II. *Requests for Admissions*

A trial court has broad discretion in matters pertaining to discovery, and the exercise of that discretion will not be reversed by the appellate court absent an abuse of discretion that is prejudicial to the appealing party. *Deering v. Supermarket Investors, Inc.*, 2013 Ark. App. 56, at 7, 425 S.W.3d 832, 836. To have abused its discretion, the trial court must have not only made an error in its decision, but also must have acted improvidently, thoughtlessly, or without due consideration. *Id.*

*Hardesty v. Baptist Health*, 2013 Ark. App. 731, at 4–5, 431 S.W.3d 327, 330.

Appellant argues that the trial court erred in finding appellee's testimony credible and in denying the motions to deem the request for admissions as admitted and for default judgment. Appellee testified that she did not receive the request for admissions because she was not living at 1412 CR 739, Brookland, Arkansas, on November 13, 2014. She said she had "just" moved into a larger house a couple of blocks down the road, and her mail was being forwarded to her. Appellant argues that a letter from his counsel along with the trial court's notice of setting and pretrial-information sheet were mailed to appellee on October 7, 2014, via certified mail, restricted delivery, return receipt requested, and were returned unclaimed. He asserts that appellee did receive the protective order that was filed on November 21, 2014. Also, on January 13, 2015, the trial-court assistant mailed a letter to appellee at the Brookland address, and it was returned on February 5, 2015, with the hand-written message "refused" and a United States Post Office sticker with the message "Return to Sender, Refused, Unable to Forward." Therefore, appellant contends that the trial court erred in finding appellee's testimony that she did not receive the request for admissions to be credible.

We hold that there was no abuse of discretion in denying appellant's motions. Appellee testified that she had moved for a short period and was having her mail forwarded during the time she should have received appellant's request for admissions. She stated that she did not receive those requests. Because the trial court's credibility determinations are entitled to great deference, we find no abuse of discretion given the evidence before the trial court. *See Gibson v. Gibson*, 87 Ark. App. 62, 185 S.W.3d 122 (2004) (where this court affirmed the trial court's acceptance of Ms. Gibson's assertion that she did not receive the

requests for admissions with the other documents served upon her at her home in Colorado

and denied the request to deem them admitted).

### III. *Best-Interest Analysis*

Regarding visitation, this court has stated,

> The determination of visitation rights is a matter that lies within the sound discretion of the circuit court. *Hudson v. Kyle*, 365 Ark. 341, 229 S.W.3d 890 (2006). The main consideration in making judicial determinations concerning visitation is the best interest of the child. *See id.* Further, this court has traditionally reviewed matters that sounded in equity de novo on the record with respect to factual questions and legal questions. *Id.* We have stated repeatedly that we will not reverse a finding by a circuit court in an equity case unless it is clearly erroneous. *Id.* We have also stated that a finding of fact by a circuit court sitting in an equity case is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

> In resolving the clearly erroneous question, we must give due regard to the opportunity of the court to judge the credibility of witnesses. *Id.* We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Bethany v. Jones*, 2011 Ark. 67, 378 S.W.3d 731. This deference to the circuit court is even greater in cases involving child custody or visitation, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *In re Adoption of J.P.*, 2011 Ark. 535, at 12–13, 385 S.W.3d 266, 274.

> De novo review does not mean that the findings of fact of the circuit judge are dismissed out of hand and that the appellate court becomes the surrogate trial judge. *Stehle v. Zimmerebner*, 375 Ark. 446, 455–56, 291 S.W.3d 573, 580 (2009). What it does mean is that a complete review of the evidence and record may take place as part of the appellate review to determine whether the trial court clearly erred either in making a finding of fact or in failing to do so. *Id.*

*Gerking v. Hogan*, 2015 Ark. App. 678, at 2–3, ___ S.W.3d ___, ___. Further, when

visitation is at issue, we will not reverse the circuit court's decision absent an abuse of

discretion. *Bowen v. Bowen*, 2012 Ark. App. 403, at 2, 421 S.W.3d 339, 341.

SLIP OPINION

Arkansas's grandparent–visitation statute, Arkansas Code Annotated section 9–13–103(c) and (e) (Repl. 2009), provides as follows:

(c)      (1) There is a rebuttable presumption that a custodian's decision denying or limiting visitation to the petitioner is in the best interest of the child.

(2) To rebut the presumption, the petitioner must prove by a preponderance of the evidence the following:

(A) The petitioner has established a significant and viable relationship with the child for whom he or she is requesting visitation; and

(B) Visitation with the petitioner is in the best interest of the child.

. . . .

(e) To establish that visitation with the petitioner is in the best interest of the child, the petitioner must prove by a preponderance of the evidence the following:

(1) The petitioner has the capacity to give the child love, affection, and guidance;

(2) The loss of the relationship between the petitioner and the child is likely to harm the child; and

(3) The petitioner is willing to cooperate with the custodian if visitation with the child is allowed.

Appellant claims that the trial court erred in finding that the evidence presented was insufficient to rebut the presumption that a custodian's decision to deny grandparent visitation was in the best interest of the child.  First, he contends that he has the capacity to give the child love, affection, and guidance.  He claims that the trial court erred in finding that each of his three children had significant issues as adults because the evidence was that he had a wonderful relationship with his youngest daughter, Melody.  He also claims that Jarrod suffers from alcoholism and depression and that appellant attended alcoholic-support programs with appellee in hopes of helping Jarrod and supporting his recovery.  He argues that his daughter Laura suffers from alcoholism, but when she was sober, she accomplished

SLIP OPINION

many things and was successful in business. He contends that both of these children have a genetic predisposition to alcoholism, and their alcoholism is not correlated to his parenting or love for them. He claims that the trial court erred in relying on Laura's sexual-abuse allegations because he had her removed from the home when she was in high school because she was dangerous to the family. He points to at least one granddaughter's anger at Laura for making the accusations and her insistence that appellant never did anything to make her feel uncomfortable. He also emphasizes that the investigation was unfounded and closed. He contends that he has an extraordinarily close relationship with Ms. Timmons, the mother of two of his grandchildren, and that he sees those children many times a month.

Second, he claims that the loss of the relationship between him and the child is likely to harm the child. He cites *Grant v. Richardson*, 2009 Ark. App. 187, 300 S.W.3d 499, for the proposition that grandparent visitation is in the children's best interest when evidence is presented that, without court-ordered visitation, the grandparent would likely be denied reasonable visitation with the children. However, the Arkansas Supreme Court overruled *Grant* to the extent that it conflicted with its holding that evidence must be presented to demonstrate that the relationship between the grandparents and grandchild "had been lost or would be lost." *In re Adoption of J.P.*, 2011 Ark. 535, at 16–17, 385 S.W.3d 266, 276. Appellant also cites *Favano v. Elliott*, 2012 Ark. App. 484, 422 S.W.3d 162 (Abramson, J., dissenting), for the dissent's belief that proof that a child will lose a nurturing, loving relationship with an entire branch of the family is sufficient to support a finding of likely harm.

SLIP OPINION

In support of his argument, appellant asserts that there is no court order awarding his son Jarrod visitation with C.J.; appellant spent more time with C.J. after Jarrod was out of her life; C.J. saw her half sisters before moving to Arkansas; C.J. and her half sisters spent time together with appellant; and appellant can facilitate a relationship between C.J. and her half sisters, as well as other people on her father's side of the family. Appellant contends that appellee's concern about C.J. being adopted by appellee's new husband and becoming confused over her relationship with appellant's family is not warranted. He claims that he has been the constant in C.J.'s life, as opposed to appellee's moving her to Arkansas and exposing her to new relationships.

Appellant also claims that the trial court's finding that he sexually abused the child is erroneous. He recounts his testimony regarding C.J.'s complaints while using the bathroom on the last day of their visit and his actions regarding same. He also contends that C.J. never once stated that he hurt her when she was questioned by the Arkansas State Police Investigator. Appellant reiterates his testimony that C.J. did not want to sleep alone, that his wife did not want to sleep with a squirmy child, and that appellee knew that appellant had stayed in the same hotel room as C.J. in February 2014. Appellant also claims that the house appellee and her children lived in prior to her move was small and had only two bedrooms; thus, he contends that C.J. had not always slept in a room by herself.

Appellant argues that the trial court's reliance on the fact that the four year old wet her bed as an indication of sexual abuse was in error. He argues that the child wet the bed the night before the incident. Further, he contends that it is not uncommon for children

SLIP OPINION

to improperly wipe or to have damp panties after they go to the bathroom. He claims that appellee's testimony at trial and the information she gave investigators was not the same, and that the investigation file was closed because the allegations were unsubstantiated and unfounded. He claims that appellee's word is not credible and that the trial court erroneously failed to find that the loss of the relationship between appellant and C.J. would harm the child.

Third, appellant claims that he is willing to cooperate with appellee regarding visitation. He alleges that it is undisputed that he is willing to cooperate and that he would help facilitate transportation and have open lines of communication with appellee.

As was recited in the trial court's order, there was evidence that the child suffered from pain and swelling in her vaginal area and evidence that her grandfather touched her, although the evidence of the extent and form of the touching was contradictory. After a de novo review, and giving due regard to the trial court in determining the credibility of the witnesses, we hold that the trial court's findings were not clearly erroneous. Accordingly, the denial of appellant's request for grandparent visitation was not an abuse of discretion. Therefore, we affirm.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Henry Law Firm, PLC*, by: *Megan Henry*, for appellant.

No response.